[No. S123951. Aug. 31, 2006.]

JOEY WELLS, a Minor, etc., et al., Plaintiffs and Appellants, v. ONE2ONE LEARNING FOUNDATION et al., Defendants and Respondents;
STATE OF CALIFORNIA, Real Party in Interest and Respondent.

## Counsel

Law Offices of Michael S. Sorgen, Michael S. Sorgen, Andrea Adam Brott, Joshua N. Sondheimer, Robert S. Rivkin, Claudia A. Baldwin; Haley and Bilheimer, Allan Haley and John Bilheimer for Plaintiffs and Appellants.

James Moorman, Amy Wilken, Joseph E. B. White; Law Offices of Paul D. Scott and Paul D. Scott for Taxpayers Against Fraud as Amicus Curiae on behalf of Plaintiffs and Appellants.

Gordon & Rees, Dion N. Cominos, Fletcher C. Alford, Heather A. McKee and Mark C. Russell for Defendant and Respondent One2One Learning Foundation.

Seyfarth Shaw, James M. Nelson, Kurt A. Kappes, Jason T. Cooksey and William S. Jue for Defendant and Respondent Charter School Resource Alliance.

California Education Legal Services, Thomas M. Griffin; Girard & Vinson, Christian M. Keiner and David E. Robinett for Defendant and Respondent Camptonville Union Elementary School District.

Parks, Dingwall & Associates, Linda Rhoads Parks; Law Offices of Jon Webster and Jon Webster for Defendants and Respondents Camptonville Academy, Inc., and Janice Jablecki.

Needham, Davis, Kirwan & Young, Marc E. Davis, Marc J. Cardinal and Matt Demel for Defendant and Respondent Mattole Unified School District.

Duncan, Ball & Evans, Evans, Wieckowski & Ward, Matthew D. Evans and James B. Carr for Defendants and Respondents Sierra Summit Academy, Inc., and Sierra Plumas Joint Unified School District.

Farmer, Murphy, Smith & Alliston, Craig E. Farmer and Jojra E. Jackson for Statewide Association of Community Colleges, Southern California Regional Liability Excess Fund, Northern California Regional Liability Excess Fund and Schools Excess Liability Fund as Amici Curiae on behalf of Defendants and Respondents.

Sharon L. Browne for Pacific Legal Foundation as Amicus Curiae on behalf of Defendants and Respondents.

Declues & Burkett, J. Michael Declues and Gregory A. Wille for Coast Community College District as Amicus Curiae on behalf of Defendants and Respondents.

Gibson, Dunn & Crutcher, Joel S. Sanders, Mark A. Perry, Ethan D. Dettmer and Rebecca Justice Lazarus for PricewaterhouseCoopers LLP as Amicus Curiae on behalf of Defendants and Respondents.

Ann Miller Ravel, County Counsel (Santa Clara) and Kathryn J. Zoglin, Deputy County Counsel, for California State Association of Counties as Amicus Curiae on behalf of Defendants and Respondents.

Thomas Law Firm, R. Todd Bergin and Allen L. Thomas for Fullerton Joint Union High School District, Brea-Olinda Unified School District, Claremont Unified School District, Huntington Beach Union High School District, Long Beach Unified School District, Newport-Mesa Unified School District,

Placentia-Yorba Linda Unified School District, Pomona Unified School District, Santa Monica-Malibu Unified School District, Tustin Unified School District and Whittier Union School High School District as Amici Curiae on behalf of Defendants and Respondents.

Bill Lockyer, Attorney General, Manuel M. Medeiros, State Solicitor General, James Humes, Chief Assistant Attorney General, Christopher Ames, Assistant Attorney General, Larry G. Raskin and Mark R. Soble, Deputy Attorneys General, for Real Party in Interest and Respondent.

## OPINION

**BAXTER, J.**—The Charter Schools Act (CSA; Ed. Code, § 47600 et seq.), as adopted by the Legislature in 1992 and since amended, represents a revolutionary change in the concept of public education. Under this statute, interested persons may obtain charters to operate schools that function within public school districts, accept all eligible students, charge no tuition, and are financed by state and local tax dollars, but nonetheless retain considerable academic independence from the mainstream public education system. Such schools may elect to operate as, or be operated by, corporations organized under the Nonprofit Public Benefit Corporation Law. (*Id.*, § 47604, subd. (a).)

Here certain charter schools, their corporate operators, and the chartering school districts were sued on multiple grounds by some of the schools' students and their parents or guardians. The gravamen of all the claims is that the schools—designed to provide and facilitate home instruction through use of the Internet (so-called distance learning)—failed to deliver instructional services, equipment, and supplies as promised, and as required by law. In effect, plaintiffs assert, the schools functioned only to collect "average daily attendance" (ADA) forms, on the basis of which the schools, and the districts, fraudulently claimed and received public education funds from the state. Plaintiffs also claim violations of specific statutory rules governing "independent study" programs offered by the public schools.

This case concerns whether, and in what circumstances, public school districts, charter schools, and/or the operators of such schools may be exposed to civil liability based on allegations of this kind. Among other things, we must determine whether such entities, or any of them, are "persons" who may be sued (1) under the unfair competition law (UCL; Bus. & Prof. Code, § 17200 et seq.) and (2) in a qui tam action, brought by

individuals on behalf of the state, under the California False Claims Act (CFCA; Gov. Code, § 12650 et seq.).[1]

We reach the following conclusions: (1) Public school districts are not "persons" who may be sued under the CFCA. (2) On the other hand, the charter schools in this case, and their operators, are "persons" subject to suit under both the CFCA and the UCL, and are not exempt from either law merely because such schools are deemed part of the public school system. (3) The CFCA cause of action is not a barred claim for "educational malfeasance" (see *Peter W. v. San Francisco Unified Sch. Dist.* (1976) 60 Cal.App.3d 814 [31 Cal.Rptr. 854] (*Peter W.*)) insofar as it asserts, not simply that One2One's charter schools provided a *substandard* education, but that they submitted false claims for school funds while failing to furnish *any* significant educational services, materials, and supplies. (4) The CFCA cause of action is not barred insofar as it alleges that, before 2000, the charter schools violated "independent study" rules set forth in a 1993 statute, Education Code section 51747.3, because section 51747.3 applied to charter schools even before its amendment in 1999. (5) Finally, a qui tam action under the CFCA against a charter school or its operator is not subject to the Tort Claims Act (TCA; Gov. Code, § 815 et seq.) requirement of prior presentment of a claim for payment (see *id.*, §§ 905, 910 et seq.). These conclusions require that we affirm in part, and reverse in part, the judgment of the Court of Appeal.

## FACTS AND PROCEDURAL BACKGROUND

On December 30, 1999, plaintiffs filed a complaint, which included a claim for qui tam relief on behalf of the state, under the CFCA. (Gov. Code, § 12652, subd. (c)(1).) As provided by the CFCA in such cases, the complaint was filed under seal. (Gov. Code, § 12652, subd. (c)(2).) In July 2000, after the seal was lifted, the Attorney General noticed his election to intervene in, and proceed with, the CFCA action on behalf of the state. (Gov. Code, § 12652, subd. (c)(6).)

---

[1] The CFCA provides a single definition of "person" for all purposes of that statute. "Persons" who knowingly submit false claims to state or local governments may be sued under the CFCA (Gov. Code, § 12651), and, under certain circumstances, "persons" may also *bring* "qui tam" actions, *on behalf of* defrauded governmental entities, *against* alleged false claimants (*id.*, § 12652, subd. (c)). Here, as noted above, we consider, among other things, whether public entities are "persons" who *may be sued* as false claimants under the CFCA. In a companion case, *State of California ex rel. Harris v. PricewaterhouseCoopers, LLP* (2006) 39 Cal.4th 1220 [48 Cal.Rptr.3d, 141 P3d 256] (*Harris*), we address the question whether a governmental entity is a person who, as a qui tam plaintiff under the CFCA, *may sue* for alleged false claims that were submitted only to *other* public agencies.

On August 11, 2000, plaintiffs filed their first amended complaint (the complaint). As pertinent to the issues before us, the complaint alleged the following:

At various times during 1997, 1998, and 1999, defendant One2One Learning Foundation (One2One), a Texas corporation, operated three charter schools in California through its California corporate alter ego, defendant Charter School Resource Alliance (CSRA). These schools included (1) defendant Sierra Summit Academy, Inc. (Sierra Summit Academy), operating as a California nonprofit corporation, and chartered by the Sierra Plumas Joint Unified School District (Sierra District) in Sierra County, (2) defendant Mattole Valley Charter School (Mattole Valley School), chartered by the Mattole Unified School District (Mattole District) in Humboldt County, and (3) defendant Camptonville Academy, Inc. (Camptonville Academy), operating as a California nonprofit corporation, and chartered by defendant Camptonville Union Elementary School District (Camptonville District) in Yuba County.

Defendant Robert Carroll is One2One's president and chief executive officer. Defendant Jeff Bauer is Superintendent of the Sierra District. Defendant Carol Kennedy is the Director of Sierra Summit Academy. Defendant Richard Graey is Superintendent of the Mattole District and the Director of Mattole Valley School. Defendant Allen Wright is Superintendent and Principal of the Camptonville District. Defendant Janis Jablecky is the Director of Camptonville Academy.[2]

Each plaintiff was a minor student enrolled in one of defendant charter schools at some time during 1998 and/or 1999, or the parent and/or guardian of such a student. All plaintiffs were direct victims of One2One's failure to provide promised instruction, testing, equipment, materials, and supplies.

Like traditional public schools, charter schools are funded by the state based on ADA records. While charter schools have considerable freedom in their academic approach, they must meet statewide educational standards and use appropriately credentialed teachers. The chartering entity, usually a school district, has oversight responsibilities, and must revoke a school's charter for fiscal mismanagement, material violation of the charter, failure to meet or pursue any of the educational outcomes set by the charter, failure to meet generally accepted accounting principles, or violation of law.

---

[2] One2One, CSRA, Sierra Summit Academy, Mattole Valley School, and Camptonville Academy, as identified and described in the complaint, are hereafter collectively referred to as the charter school defendants. The Sierra District, the Mattole District, and the Camptonville District are hereafter collectively referred to as the district defendants. The charter school defendants, the district defendants, and the individual defendants are hereafter collectively referred to as all defendants.

Sierra Summit Academy, Mattole Valley School, and Camptonville Academy were operated as distance learning schools, in which students study at home, complete lessons on their computers, and transmit them via the Internet to the school. Students are also tested through the Internet.

The charters and promotional literature for One2One-operated schools promised to provide "ways and means" for students to achieve an education through distance learning, including the furnishing of computers, necessary software, and textbooks, and reimbursement of up to $100 per month for out-of-pocket educational expenses incurred by students or their parents or guardians. Each student was also to be assigned an "educational facilitator," who was to devise a learning contract for the student, provide parents with a copy of the student's curriculum goals, order necessary educational materials, and come to the student's home a few hours per week for personal instruction, testing, and evaluation.

Despite its promises, One2One has failed to provide the enumerated equipment, supplies, and services, either to plaintiff students or to any of its enrollees. Its educational facilitators—who, on information and belief, are teaching outside their credentialed areas or are not credentialed at all—do not provide assessment, instruction, review, or curriculum, either online or in person. One2One also fails to reimburse students, parents, and guardians for educational expenses. In some cases, parents actually pay One2One for equipment and for educational materials and supplies, either because One2One has failed to provide these items for free as promised, or because parents have exhausted their $100 per month expense allowance. Moreover, One2One overbills for the educational materials and software it does provide. In particular, the educational software programs One2One uses are available online for free, or for much less than One2One charges.[3]

One2One aggressively recruits poor, rural districts to approve their charter schools, then enrolls students throughout the state for distance learning. In return for chartering its schools and allowing their operation, One2One pays the districts administration fees in excess of those allowed by statute. Despite their oversight responsibilities, the districts enable One2One to misuse public funds by turning a blind eye to the charter schools' activities, and, for the most part, failing to take steps to monitor them.

---

[3] Included in the complaint were detailed allegations concerning the charter schools' treatment of the named plaintiffs, including the schools' broken promises to supply computers and educational materials, and the failure of their "educational facilitators" to provide home visits, or any other significant contact, except for "religious" visits to collect signed ADA forms. The complaint also contained class action allegations.

On the basis of allegations such as these, the complaint asserted causes of action against the charter school defendants for breach of contract (seventh cause of action) and intentional and negligent misrepresentation (fourth and fifth causes of action, respectively). Against the charter school and district defendants, it contained claims for mandamus and declaratory relief (third and 10th causes of action, respectively), and for violation of the free school, equal protection, and due process guarantees of the California Constitution (eighth and ninth causes of action, respectively). As to all defendants, it sought injunctive relief against misuse of taxpayer funds (second cause of action).

Finally, the complaint included, (1) against the charter school and district defendants, a CFCA cause of action for qui tam relief, on behalf of the state, for the alleged submission of false and fraudulent claims for payment of state educational funds (first cause of action) and, (2) against the charter school defendants, an individual and representative claim under the UCL, alleging unfair and deceptive business practices in the operation of the schools (sixth cause of action).

The CFCA cause of action asserted that the charter school defendants submitted false claims, within the meaning of this statute, by requesting funding from the districts and/or the state, "knowing that their ADA records did not accurately reflect the students enrolled in and receiving instruction, educational materials, or services from their schools." (At another point, the complaint alleged more generally that One2One "fails to provide the education it promises but falsely collects State educational funds as if the education were provided.")

The CFCA count also alleged that the charter school defendants falsely claimed ADA funds (1) for what was effectively independent study, though the schools were in violation of Education Code section 51747.3, subdivision (a), in that they provided money or other things of value to independent study pupils that were not provided to students attending regular classes, and (2) for independent study pupils who, in violation of subdivision (b) of the same section, resided outside the counties in which the respective schools were located, or adjacent counties.[4]

---

[4] According to the complaint, for each of the 5,200 students enrolled statewide in its distance learning charter schools, One2One collects ADA funds of about $120 per day, or $4,350 per school term. The complaint thus asserted generally that, on the basis of One2One's failure to provide educational services and materials as promised in its charters and required by law, "One2One engages in a practice of defrauding parents, school districts, and the State by collecting more than $20 million annually in educational funds."

In the CFCA cause of action, the complaint alleged that the district defendants had submitted false claims on behalf of the charter schools, even though they "knew or deliberately or recklessly disregarded whether the public funds were being used for wrongful purposes." Further, the complaint asserted, the district defendants wrongfully claimed funds for supervisory services beyond the limits set forth in the CSA.

Aside from the injunctive and declaratory relief noted above, the complaint sought, among other things, (1) compensatory and punitive damages against the charter school defendants, and, (2) against the charter school and district defendants, restitution of funds falsely claimed and received, with treble damages and civil penalties as provided in the CFCA.

Several defendants demurred.[5] In November 2001, the trial court sustained, without leave to amend, the demurrers as to the first (CFCA), second (taxpayer injunctive relief), fourth (intentional misrepresentation), fifth (negligent misrepresentation), sixth (UCL), and seventh (breach of contract) causes of action.[6] The court reasoned as follows: (1) All these counts are noncognizable private claims for "educational malfeasance." (2) Because the charter school and district defendants are "public entities," the CFCA, intentional misrepresentation, and negligent misrepresentation causes of action are subject to the TCA requirement of prior presentment of a claim for payment. (3) As "public entities," the charter school defendants are not "persons" subject to suit under the UCL. (4) The taxpayer claim for injunctive relief is subject to the requirement of a prior claim for refund. (5) The CFCA claim for violation of the statutory restrictions on "independent study" programs fails, because those restrictions applied to charter schools only in and after 2000, and all the facts alleged in the complaint precede that date.[7]

---

[5] Separate demurrers were filed by (1) CSRA and Carroll, (2) Sierra Summit Academy, Sierra District, Bauer, and Kennedy, and (3) One2One. One2One later filed a joinder in the demurrer of CSRA and Carroll.

[6] Previously, in September 2001, the trial court had denied the State of California's motion to dismiss plaintiffs' CFCA claim for lack of jurisdiction. The motion was made under Government Code section 12652, subdivision (d)(3)(A), which deprives the court of jurisdiction over a private qui tam CFCA action that is based on the prior "public disclosure" of the facts supporting the claim, where the disclosure was made "in a criminal, civil, or administrative hearing, in an investigation, report, hearing, or audit conducted by or at the request of the Senate, Assembly, auditor, or governing body of a political subdivision, or by the news media," unless the qui tam plaintiff "is an original source of the information." The ruling on this motion is not involved in the appeal before us.

[7] After an initial hearing on the demurrers, the trial court issued a final ruling as to the second (taxpayer injunctive relief), third (mandamus), fourth (intentional misrepresentation), fifth (negligent misrepresentation), seventh (breach of contract), eighth (free school guarantee), ninth (equal protection and due process), and 10th (declaratory relief) causes of action. However, as to the first (CFCA) and sixth (UCL) causes of action, the court obtained additional briefing on whether, in light of a then recent Court of Appeal decision, *LeVine v. Weis*

All parties stipulated that (1) the trial court's ruling on the demurrers was binding, as law of the case, on those defendants who had not demurred, (2) the remaining causes of action would be dismissed in order to facilitate appellate review, and (3) plaintiffs would dismiss the individual defendants. Judgment was entered accordingly.

Plaintiffs appealed, urging that the CFCA, UCL, contract, and misrepresentation claims should not have been dismissed.[8] The Court of Appeal reversed the judgment of dismissal. The Court of Appeal agreed with the trial court that the causes of action for breach of contract and misrepresentation are barred by the rule that private parties cannot sue public schools for "educational malfeasance." The Court of Appeal also concurred that the charter school defendants, as part of the public school system, are "public entities," and thus are not "persons" who may be sued under the UCL.

On the other hand, the Court of Appeal held that the CFCA, unlike the UCL, does include public entities among the "persons" who may be sued. Hence, the Court of Appeal determined, charter schools and public school districts may be subject to private qui tam actions under the CFCA. Moreover, the Court of Appeal reasoned, plaintiffs' CFCA allegations—i.e., that the charter school and district defendants made or facilitated fraudulent claims to obtain state ADA funds for educational services that were not provided—are not a prohibited cause of action for "educational malfeasance."

Nor, the Court of Appeal concluded, must a qui tam action under the CFCA be preceded by presentment of a claim for payment pursuant to the TCA. In this regard, the Court of Appeal noted that (1) the state is expressly exempt from the TCA's "prior presentment" requirement (Gov. Code, § 905, subd. (i)), (2) a qui tam plaintiff under the CFCA stands in the shoes of the state, and (3) application of a "prior presentment" requirement in this context would undermine the CFCA's provision that qui tam actions must initially be

---

(2001) 90 Cal.App.4th 201 [108 Cal.Rptr.2d 562] (*LeVine II*) (see also *LeVine v. Weis* (1998) 68 Cal.App.4th 758 [80 Cal.Rptr.2d 439] (*LeVine I*)), the charter school and district defendants, as "public entities within the public school system," could be sued under the CFCA and the UCL. In its final ruling, as noted, the court determined that the charter school defendants were not subject to suit under the UCL, but the court did not decide whether a similar rule applied to either the charter school or district defendants under the CFCA.

[8] No defendant cross-appealed from the trial court's order *overruling* demurrers to the third (mandate), eighth (free school guarantee), ninth (equal protection/due process), and 10th (declaratory relief) causes of action. Nor did any of defendants' Court of Appeal briefs argue that those counts should have been dismissed. By the same token, after stipulating in the trial court to dismissal of individual defendants Carroll, Bauer, Kennedy, Graey, Wright, and Jablecki, plaintiffs did not contend in the Court of Appeal that the second cause of action (taxpayer relief)—the only one naming those defendants—should be reinstated. The State of California, as real party and respondent, filed a brief asserting only that the "prior claim" requirement of the TCA should not apply to qui tam actions under the CFCA.

filed under seal, thus allowing the state to investigate, without prior warning to the alleged false claimant, before deciding whether to intervene in the action.

Finally, however, the Court of Appeal concurred with the trial court that plaintiffs' CFCA claim must fail insofar as it is based on allegations that the charter schools violated the "independent study" statute (Ed. Code, § 51747.3). Like the trial court, the Court of Appeal concluded that, while the complaint covered only acts done by the charter school defendants in the years 1998 and 1999, the "independent study" statute did not apply to charter schools until the year 2000.

The Court of Appeal remanded for further proceedings consistent with its opinion. We understand the effect of the Court of Appeal's judgment to be that plaintiffs may proceed against both the district and charter school defendants on the CFCA cause of action—minus the allegations concerning violation of the statutory rules governing "independent study" programs—but may not proceed on the UCL, contract, or misrepresentation causes of action.

Petitions for review were filed by defendants (1) One2One, (2) CSRA, (3) the Mattole District and Graey, (4) Camptonville Academy and Jablecki, and (5) the Sierra District and Sierra Summit Academy. All challenged the Court of Appeal's reinstatement of plaintiffs' CFCA cause of action. The petitions variously argued that (1) the charter school and district defendants are "public entities," and as such, are not "persons" subject to suit under the CFCA, (2) a *qui tam* action under the CFCA is subject to the "claim presentment" provisions of the TCA, and (3) the CFCA allegations are a disguised claim for "educational malfeasance."

Plaintiffs answered the petitions, urging, as additional issues, that (1) the restrictions on "independent study" programs imposed by Education Code section 51747.3 have applied to charter schools since that statute's adoption in 1993 and (2) private nonprofit corporations operating charter schools are "persons" covered by the UCL. We granted review. As will appear, we agree with certain of the Court of Appeal's holdings and disagree with others. We will therefore reverse in part the Court of Appeal's judgment.[9]

---

[9] Amicus curiae briefs in support of defendants have been filed by (1) the Statewide Association of Community Colleges et al., (2) Fullerton Joint Union High School District et al., (3) the Pacific Legal Foundation, (4) the California State Association of Counties, (5) Coast Community College District, and (6) PricewaterhouseCoopers, LLP. An amicus curiae brief in support of plaintiffs has been filed by Taxpayers Against Fraud. We appreciate the assistance provided by these briefs.

**DISCUSSION**

1. *The CSA.*

■ The CSA, as adopted in 1992 and since substantially amended, is intended to allow "teachers, parents, pupils, and community members to establish . . . schools that operate independently from the existing school district structure." (Ed. Code, § 47601.) By this means, the CSA seeks to expand learning opportunities, encourage innovative teaching methods, provide expanded public educational choice, and promote educational competition and accountability within the public school system. (Ed. Code, § 47601, subds. (a)–(g).)

If statutory requirements are met, public school authorities must grant the petition of interested persons for a charter to operate such a school within a public school district. (Ed. Code, § 47605.) For certain purposes, the school is "deemed to be a 'school district' " (*id.*, § 47612, subd. (c)), is "part of the Public School system" (*id.*, § 47615, subd. (a)), falls under the "jurisdiction" of that system, and is subject to the "exclusive control" of public school officers (*id.*, § 47615, subd. (a)(2); see § 47612, subd. (a)). (See *Wilson v. State Bd. of Education* (1999) 75 Cal.App.4th 1125, 1136–1142 [89 Cal.Rptr.2d 745] (*Wilson*).)

A charter school must operate under the terms of its charter, and must comply with the CSA and other specified laws, but is otherwise exempt from the laws governing school districts. (Ed. Code, § 47610.) A charter school may elect to operate as, or be operated by, a nonprofit corporation organized under the Nonprofit Public Benefit Corporation Law. (*Id.*, § 47604, subd. (a), as added by Stats. 1998, ch. 34, § 3.)

A charter school is eligible for its share of state and local public education funds, which share is calculated primarily, as with all public schools, on the basis of its ADA. (Ed. Code, § 47612; see also *id.*, § 47630 et seq.)[10] Provisions added to the CSA since its original adoption enumerate certain oversight responsibilities of the chartering authority (Ed. Code, §§ 47612, 47604.32), and authorize that agency to charge the school supervisorial fees, within specified limits, for such services (*id.*, § 47613).

---

[10] California school finance is enormously complex, but the basic system is that "funds raised by local property taxes are augmented by state equalizing payments. Each school district has a base revenue limit that depends on average daily attendance, . . . and varies by size and type of district. [¶] The revenue limit for a district includes the amount of property tax revenues a district can raise, with other specific local revenues, coupled with an equalization payment by the state, thus bringing each district into a rough equivalency of revenues." (56 Cal.Jur.3d (2003) Schools, § 7, p. 198.)

### 2. *The CFCA.*

■ The CFCA, which is patterned after a similar federal law, was adopted in 1987. (Stats. 1987, ch. 1420, § 1, p. 5237.) It provides that "[a]ny person" who, among other things, "[k]nowingly presents or causes to be presented to . . . the state or . . . any political subdivision thereof, a false claim for payment or approval," or "[k]nowingly makes, uses, or causes to be made or used a false record or statement to get a false claim paid or approved by the state or by any political subdivision," or "[c]onspires to defraud the state or any political subdivision by getting a false claim allowed or paid by the state or any political subdivision," or "[i]s a beneficiary of an inadvertent submission of a false claim to the state or a political subdivision, subsequently discovers the falsity of the claim, and fails to disclose the false claim to the state or the political subdivision within a reasonable time after discovery [thereof]," "shall be liable to the state or to the political subdivision for three times the amount of damages" the state or political subdivision thereby sustained, as well as for the state's or political subdivision's costs of suit, and may also liable for a civil penalty of up to $10,000 for each false claim. (Gov. Code, § 12651, subd. (a)(1)–(3), (8).)[11]

The CFCA defines a "person" to "include[] any natural person, corporation, firm, association, organization, partnership, limited liability company, business, or trust." (Gov. Code, § 12650, subd. (b)(5).)

Where a "person" has submitted a false claim upon state funds, or upon both state and political subdivision funds, in violation of the CFCA, the Attorney General may sue that person to recover the damages and penalties provided by the statute. (Gov. Code, § 12652, subd. (a)(1).) Where the false claim was upon "political subdivision funds," or upon both state and political subdivision funds, the "prosecuting authority" of the affected political subdivision may bring such an action. (*Id.*, subd. (b)(1).)[12]

■ When either the Attorney General or the local prosecuting authority unilaterally initiates an action involving both state and political subdivision funds, the other affected official or officials must be notified. If the Attorney General initiates such an action, the local prosecuting authority may,

---

[11] In certain circumstances, where the person submitting the false claim reported it promptly and cooperated in any investigation, the court may assess less than three times the damages (though no less than two times the damages), and no civil penalty. (Gov. Code, § 12651, subd. (b).)

[12] " 'Prosecuting authority' refers to the county counsel, city attorney, or other local government official charged with investigating, filing, and conducting civil legal proceedings on behalf of, or in the name of, a particular political subdivision." (Gov. Code, § 12650, subd. (b)(4).)

upon receiving notice, intervene. If the local prosecuting attorney is the initiator, the Attorney General may, upon notice, elect to assume responsibility for the action, though the local prosecuting authority may continue as a party. (Gov. Code, § 12652, subds. (a)(2), (3), (b)(2), (3).)

A CFCA action may also be initiated by a "person," as a "qui tam" plaintiff, for and in the name of the state or the political subdivision whose funds are involved. (Gov. Code, § 12652, subd. (c)(1), (3).) The complaint in such an action shall be filed in camera, and may remain under seal for up to 60 days. While the complaint remains sealed, "[n]o service shall be made on the defendant." (*Id.*, subd. (c)(2).)

The qui tam plaintiff must immediately notify the Attorney General of the suit and disclose to him all material evidence and information the plaintiff possesses. If the qui tam complaint involves only state funds, the Attorney General may, within the 60-day period or extensions thereof, elect to intervene and proceed with the action. If political subdivision funds alone are involved, the Attorney General must forward the qui tam complaint to the local prosecuting authority, who may elect to intervene and proceed with the action. If both state and political subdivision funds are involved, the Attorney General and the local prosecuting authority are to coordinate their investigation and review. Either official, or both of them, may then elect to intervene and proceed with the action. If these officials decline to proceed, the qui tam plaintiff shall have the right to conduct the action. (Gov. Code, § 12652, subd. (c)(4)–(8).) If state or local officials intervene, they may assume control of the action, but the qui tam plaintiff may remain as a party. (*Id.*, subd. (e)(1).)

■ A substantial portion of the proceeds of any settlement or court award in a CFCA action—as much as 66 percent—does not revert to the general coffers of the state or the political subdivision against which the false claim was submitted. Instead, a significant "cut" of these proceeds goes to those who pursued the action on behalf of the defrauded entity.

Thus, if the Attorney General or a local prosecuting authority initiated a CFCA action, that officer is entitled to a fixed 33 percent of the proceeds of the action, or settlement thereof. Where a local prosecuting authority intervened in an action initiated by the Attorney General, the court may award the local prosecuting authority a portion of the Attorney General's 33 percent, as appropriate to the local authority's role in conducting the action. If, in an action brought by a qui tam plaintiff, the Attorney General or the local prosecuting authority proceeds with the action, that official receives a fixed 33 percent of the proceeds, and the qui tam plaintiff receives from 15 to 33 percent, depending on his or her litigation role. Where both the Attorney

General and a local prosecuting authority are involved in a qui tam action, the court may award the latter officer a portion of the Attorney General's 33 percent, depending on the role played by the local prosecutor.[13] If neither the Attorney General nor the local prosecuting authority elects to proceed with the action, the qui tam plaintiff may receive between 25 and 50 percent of the proceeds. (Gov. Code, § 12652, subd. (g).)

The CFCA's remedies are cumulative to any others provided by statute or common law. (Gov. Code, § 12655, subd. (a).) Further, its provisions "shall be liberally construed and applied to promote the public interest." (*Id.*, subd. (c).)

### 3. *The UCL.*

As pertinent here, the UCL provides for relief by civil lawsuit against "[a]ny person who engages, has engaged, or proposes to engage in unfair competition." (Bus. & Prof. Code, § 17203.) "Unfair competition" is defined to include "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising . . . ." (*Id.*, § 17200.) An action for injunctive relief, which relief may include orders necessary "to restore to any person in interest any money or property . . . acquired by means of such unfair competition" (*id.*, § 17203), may be brought (1) by the Attorney General or a specified local prosecuting officer "upon their own complaint or upon the complaint of any board, officer, person, corporation, or association," or (2) "by any person who has suffered injury in fact and has lost money or property as a result of such unfair competition" (*id.*, § 17204). For purposes of the UCL, "the term person shall mean and include natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons." (*Id.*, § 17201.) Except as otherwise specifically provided, the UCL's remedies are "cumulative to each other and to the remedies or penalties available under all other laws of this state." (*Id.*, § 17205.)

### 4. *May a public school district be sued under the CFCA?*

The Court of Appeal held that both the district and charter school defendants are "persons" subject to suit under the CFCA. The district defendants insist that they are not "persons" for purposes of this statute. For reasons that will appear, we agree with the district defendants.

---

[13] Any proceeds recovered by the Attorney General as his "cut" of the award or settlement are deposited into a special False Claims Act Fund in the State Treasury. The Attorney General is to use the money in this fund, upon its appropriation by the Legislature, for the ongoing investigation and prosecution of false claims. (Gov. Code, § 12652, subd. (j).)

■ We apply well-settled principles of statutory construction. Our task is to discern the Legislature's intent. The statutory language itself is the most reliable indicator, so we start with the statute's words, assigning them their usual and ordinary meanings, and construing them in context. If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs. On the other hand, if the language allows more than one reasonable construction, we may look to such aids as the legislative history of the measure and maxims of statutory construction. In cases of uncertain meaning, we may also consider the consequences of a particular interpretation, including its impact on public policy. (E.g., *MW Erectors, Inc. v. Niederhauser Ornamental & Metal Works Co., Inc.* (2005) 36 Cal.4th 412, 426 [30 Cal.Rptr.3d 755, 115 P.3d 41]; *People v. Smith* (2004) 32 Cal.4th 792, 797–798 [11 Cal.Rptr.3d 290, 86 P.3d 348].)

■ As noted, the CFCA defines covered "persons" to "include[] any natural person, corporation, firm, association, organization, partnership, limited liability company, business, or trust." (Gov. Code, § 12650, subd. (b)(5).) We observe at the outset that while this list is not necessarily comprehensive, the only words and phrases it uses are those most commonly associated with private individuals and entities. While, in the broadest sense, a school district might be considered an "association" or an "organization," the statutory list of "persons" contains no words or phrases most commonly used to signify public school districts, or, for that matter, any other public entities or governmental agencies.

Yet the statute makes very specific reference to governmental entities in other contexts. Thus, it provides that any "person" who presents a false claim to the "state or [a] political subdivision" is liable to such entity for two or three times the damage thereby sustained. (Gov. Code, § 12651, subds. (a), (b).) A "political subdivision" is defined to include "any city, city and county, county, tax or assessment district, or other legally authorized local government entity with jurisdictional boundaries." (*Id.*, § 12650, subd. (b)(3).) The specific enumeration of state and local governmental entities in one context, but not in the other, weighs heavily against a conclusion that the Legislature intended to include public school districts as "persons" exposed to CFCA liability.

In other contexts, the Legislature has demonstrated that similar definitions of "persons" do not include public entities, and that legislators know how to include such entities directly when they intend to do so. For example, under the Fair Employment and Housing Act (FEHA; Gov. Code, § 12900 et seq.), a "person" is defined to "include[] one or more individuals, partnerships, associations, corporations, limited liability companies, legal

representatives, trustees, trustees in bankruptcy, and receivers or other fiduciaries." (*Id.*, § 12925, subd. (d).) FEHA provides that an " '[e]mployer' includes any *person* regularly employing five or more persons, or any person acting as an agent of an employer, directly or indirectly, *the state or any political or civil subdivision of the state, and cities*," except as otherwise specified. (Gov. Code, § 12926, subd. (d), italics added.) This conceptual separation of "persons" from governmental entities in FEHA is an additional indication that the CFCA's definition of "person" does not include public entities.[14]

The legislative history of the CFCA contains no explicit discussion of the scope of the word "person." Nonetheless, the limited evidence available suggests there was no intent to include school districts and other public and governmental agencies. As originally introduced on March 4, 1987, Assembly Bill No. 1441 (1987–1988 Reg. Sess.) (Assembly Bill No. 1441), which in final form became the CFCA, explicitly included, as covered "persons," "any person, firm, association, organization, partnership, business trust, corporation, company, *district, county, city and county, city, the state, and any of the agencies and political subdivisions of these entities*." (Italics added.) A substantial subsequent amendment to the bill *excised the references to governmental entities*, and the definition of "person" was changed to the form finally adopted. (Assem. Bill No. 1441, as amended in Assem. (Apr. 29, 1987) § 1; see Stats. 1987, ch. 1420, § 1, pp. 5237, 5238.)[15] Our past

---

[14] Perusal of the codes discloses other similar examples. Labor Code section 18 defines "person," for all purposes of that code, to mean "any person, association, organization, partnership, business trust, limited liability company, or corporation." In division 4 of the Labor Code, concerning workers' compensation insurance, a covered "employer" is defined to include "[e]very *person* including any public service corporation, which has any natural person in service" (Lab. Code, § 3300, subd. (c), italics added) and, additionally and separately, "[t]he State and every State agency" (*id.*, subd. (a)) and "[e]ach county, city, district, and all public and quasi public corporations and public agencies therein" (*id.*, subd. (b)). Section 19 of the Water Code defines "[p]erson," for all purposes of that code, to mean "any person, firm, association, organization, partnership, business trust, corporation, limited liability company, or company." However, for purposes of division 7 of that code, concerning water quality, " '[p]erson' " *also* "includes any city, county, district, the state, and the United States. . . ." (Wat. Code, § 13050, subd. (c).)

On the other hand, amicus curiae Taxpayers Against Fraud invokes the maxim *expressio unius est exclusio alterius*. Amicus curiae notes that Government Code section 12652, subdivision (d)(1), explicitly prohibits, under certain circumstances, *qui tam* actions against "Member[s] of the State Senate or Assembly, . . . member[s] of the state judiciary, . . . elected official[s] in the executive branch of the state, or . . . member[s] of the governing body of [a] political subdivision." By exempting these particular "public" defendants, amicus curiae argues, the CFCA must mean to include all others. We are not persuaded. The designated officials, as natural persons, clearly fall within the statute's definition of covered "persons," and thus must be expressly exempted in situations where the statute intends exemption.

[15] The current reference to "limited liability company" in the statutory definition was added to the CFCA by a 1994 amendment. (Stats. 1994, ch. 1010, § 141, pp. 6087, 6088.)

decisions note deletions from bills prior to their passage as significant indicia of legislative intent. (E.g., *Sierra Club v. California Coastal Com.* (2005) 35 Cal.4th 839, 852 [28 Cal.Rptr.3d 316, 111 P.3d 294]; *People v. Birkett* (1999) 21 Cal.4th 226, 240–242 [87 Cal.Rptr.2d 205, 980 P.2d 912]; but cf. *American Financial Services Assn. v. City of Oakland* (2005) 34 Cal.4th 1239, 1261–1262 [23 Cal.Rptr.3d 453, 104 P.3d 813].)

 A traditional rule of statutory construction is that, absent express words to the contrary, governmental agencies are not included within the general words of a statute. (E.g., *Estate of Miller* (1936) 5 Cal.2d 588, 597 [55 P.2d 491]; *Balthasar v. Pacific Elec. Ry. Co.* (1921) 187 Cal. 302, 305 [202 P. 37].) However, plaintiffs and their amici curiae invoke a more recent exception to this principle, i.e., that government agencies are excluded from the operation of general statutory provisions "only if their inclusion would result in an infringement upon sovereign governmental powers. . . . Pursuant to this principle, governmental agencies have been held subject to legislation which, by its terms, applies simply to any 'person.' [Citations.]" (*City of Los Angeles v. City of San Fernando* (1975) 14 Cal.3d 199, 276–277 [123 Cal.Rptr. 1, 537 P.2d 1250]; see also, e.g., *Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 933 [101 Cal.Rptr. 568, 496 P.2d 480] (*Nestle*); *Flournoy v. State of California* (1962) 57 Cal.2d 497, 498–499 [20 Cal.Rptr. 627, 370 P.2d 331]; *Hoyt v. Board of Civil Service Commrs.* (1942) 21 Cal.2d 399, 402 [132 P.2d 804].) In at least one instance, this premise was applied to a statutory definition of covered "persons" somewhat like that used in the CFCA. (*State of California v. Marin Mun. W. Dist.* (1941) 17 Cal.2d 699, 704 [111 P.2d 651] [county held subject to statute allowing Department of Public Works to order "any person" to move his pipeline as necessary for public safety or highway improvement; statute defined "person" to include " 'any person, firm, partnership, association, corporation, organization, or business trust,' " and did not expressly name governmental entities].)

In *LeVine I, supra*, 68 Cal.App.4th 758, the Court of Appeal held that the defendant school district was a "person" within the scope of the CFCA, and was thus subject to CFCA provisions prohibiting retaliation against an employee for reporting a false claim or furthering a false claims action (Gov. Code, § 12653, subd. (b)). Invoking the "rule that governmental agencies are excluded from the general provisions of a statute only if their inclusion would result in an infringement upon sovereign powers," the Court of Appeal declined to find that the CFCA would cause such infringement. (*LeVine I, supra*, at p. 765.) The Court of Appeal reasoned that "no governmental

agency has the power, sovereign or otherwise, knowingly to present a false claim." (*Ibid.*)[16] In the case before us, the instant Court of Appeal employed a similar analysis.

We disagree with the ultimate conclusion of *Le Vine I*. In the first place, the premise that public entities are statutory "persons" unless their sovereign powers would be infringed is simply a maxim of statutory construction. While the "sovereign powers" principle can help resolve an unclear legislative intent, it cannot override positive indicia of a contrary legislative intent. As we have explained, the language, structure, and history of the particular statute before us—the CFCA—strongly suggest that public entities, including public school districts, are not "persons" subject to suit under the law's provisions. On that basis alone, we are persuaded that governmental agencies, including the district defendants in this case, may not be sued under California's false claims statute.[17]

Moreover, we do not agree with *Le Vine I*'s analysis of the "sovereign power" question. Of course school districts have no "sovereign" power or right to submit false claims against the public treasury. Nonetheless, we cannot accept *Le Vine I*'s determination that application of the CFCA to public school districts would infringe *no* sovereign powers.

As we will explain, in light of the stringent revenue, appropriations, and budget restraints under which all California governmental entities operate, exposing them to the draconian liabilities of the CFCA would significantly impede their fiscal ability to carry out their core public missions. In the particular case of public school districts, such exposure would interfere with the state's plenary power and duty, exercised at the local level by the individual districts, to provide the free public education mandated by the Constitution.

---

[16] In *Le Vine II*, *supra*, 90 Cal.App.4th 201, the Court of Appeal affirmed, as law of the case, its ruling in *Le Vine I* that public school districts are "persons" subject to suit under the CFCA. The *Le Vine II* court declined to reconsider its prior holding in light of several intervening federal decisions, including *Vermont Agency of Natural Resources v. United States ex rel. Stevens* (2000) 529 U.S. 765 [146 L.Ed.2d 836, 120 S.Ct. 1858] (*Stevens*). *Stevens* held that states are not "persons" subject to qui tam liability under the federal false claims statute. We discuss *Stevens* in greater detail below.

[17] We have indicated (*ante*, fn. 1) that the CFCA provides a single definition of "person," governing both who *may be sued* and *who may sue as a qui tam plaintiff*. In *Harris*, *supra*, 39 Cal.4th 1220, we consider whether public entities are "persons" for the latter purpose. As we explain in *Harris*, there is ample evidence the Legislature did not contemplate public entities as qui tam plaintiffs under the CFCA. (See *Harris*, *supra*, 39 Cal.4th at pp. 1229–1232.) Given the statute's uniform definition of "person," *Harris*'s analysis further informs our conclusion here that public entities also are not "person[s]" subject to suit under the CFCA.

■ The People, by initiative, have put all agencies of government, including school districts, on a strict fiscal diet by adding provisions to the California Constitution that limit their power to tax and spend. Article XIII A, section 1, "places a general ceiling on the ad valorem property taxes which may be levied on behalf of local governments and school districts. [Citation]." (*Butt v. State of California* (1992) 4 Cal.4th 668, 691, fn. 17 [15 Cal.Rptr.2d 480, 842 P.2d 1240] (*Butt*).) Article XIII A also bans other new local taxes levied by, or for the specific benefit of, school and other special districts except as approved by a two-thirds majority of the voters. (Cal. Const., art. XIII A, § 4; see *Rider v. County of San Diego* (1991) 1 Cal.4th 1, 13–15 [2 Cal.Rptr.2d 490, 820 P.2d 1000]; *Hoogasian Flowers, Inc. v. State Bd. of Equalization* (1994) 23 Cal.App.4th 1264, 1282–1284 [28 Cal.Rptr.2d 686].) At the state level, article XIII A forbids the enactment of any new ad valorem real property tax, and prohibits *all* increases in state taxes except by a two-thirds vote of each house of the Legislature. (Cal. Const., art. XIII A, § 3.)

Article XIII B generally limits the annual appropriations of state and local governments to the prior years' appropriations as adjusted for the cost of living. (Cal. Const., art. XIII B, § 1.) Under this constitutional provision, these limits may be changed only by vote of the affected electorate. (*Id.*, § 4.)[18]

Public school districts face an additional restriction on their ability to tax and spend for their educational mission. Because disparities in school funding levels based on the comparative wealth of local districts violate the equal protection clause of the California Constitution (see *Serrano v. Priest* (1976) 18 Cal.3d 728 [135 Cal.Rptr. 345, 557 P.2d 929]; *Serrano v. Priest* (1971) 5 Cal.3d 584 [96 Cal.Rptr. 601, 487 P.2d 1241]), the Legislature has adopted a strict system of equalized funding (Ed. Code, § 42238 et seq.), under which, as noted above, "the amount of property tax revenues a district can raise, with other specific local revenues, [is] coupled with an equalization payment by the state, thus bringing each district into a rough [per student] equivalency of revenues." (56 Cal.Jur.3d, *supra*, Schools, § 7, p. 198, fns. omitted.) "In obedience to *Serrano* principles, the current system of public school finance largely eliminates the ability of local districts, rich or poor, to increase local ad valorem property taxes to fund current operations at a level exceeding their [s]tate-equalized revenue per average daily attendance. [Citation.]" (*Butt, supra*, 4 Cal.4th 668, 691, fn. 17.)

---

[18] Article XIII B allows governmental entities to establish reserve, contingency, emergency, trust, sinking, and other like funds to pay unexpected or extraordinary expenses. Payments *from* such funds do not constitute appropriations subject to limitation, but contributions *to* such funds do count against an entity's appropriations limit. (Cal. Const., art. XIII B, § 5.)

School districts must use the limited funds at their disposal to carry out the state's constitutionally mandated duty to provide a system of public education. The Constitution requires, and makes the Legislature responsible for providing, "a system of common schools by which a free school shall be kept up and supported in each district . . . ." (Cal. Const., art. IX, § 5.) The Legislature has chosen to implement this "fundamental" guarantee through local school districts with a considerable degree of local autonomy, but it is well settled that the state retains plenary power over public education. (*Butt, supra*, 4 Cal.4th 668, 680–681.)

Hence, there can be no doubt that public education is among the state's most basic sovereign powers. Laws that divert limited educational funds from this core function are an obvious interference with the effective exercise of that power. Were the CFCA applied to public school districts, it would constitute such a law. If found liable under the CFCA, school districts, like other CFCA defendants, could face judgments—payable from their limited funds—of at least *two*, and usually *three*, times the damage caused by each false submission, *plus* civil penalties of up to $10,000 for each false claim, plus costs of suit. Such exposure, disproportionate to the harm caused to the treasury, could jeopardize a district financially for years to come. It would injure the districts' blameless students far more than it would benefit the public fisc, or even the hard-pressed taxpayers who finance public education.[19]

The Legislature is aware of the stringent revenue, budget, and appropriations limitations affecting all agencies of government—and public school districts in particular. Given these conditions, we cannot lightly presume an intent to force such entities not only to make whole the fellow agencies they defrauded, but also to pay huge additional amounts, often into the pockets of

---

[19] We note that the Legislature has provided other, detailed means by which the state may discover and recoup overpayments of state educational funds to local districts. Thus, as the district defendants and several amici curiae point out, local districts must undergo independent annual audits (Ed. Code, § 41020), and the State Controller may also audit local school districts (see *id.*, §§ 14506, 14507, 41344, subd. (e)). If an audit shows the district received an overapportionment equal to, or greater than, the sum due for even one unit of ADA, the state must reduce accordingly the total ADA apportionment otherwise due to the district for a succeeding year. (*Id.*, §§ 41341, 41344.) If a single-year recoupment would create hardship for the local district, a plan may be implemented for repayment over a period of up to eight years. (*Id.*, § 41344, subd. (a)(2).) While these provisions accord the state a strict remedy for funds improperly apportioned to a local district, they also display the Legislature's realistic solicitude for the several financial constraints under which modern California school districts, like all government agencies, must carry out their vital mission. They are additional evidence that the Legislature did not intend to apply the CFCA's draconian remedies in this context.

outside parties. Such a diversion of limited taxpayer funds would interfere significantly with government agencies' fiscal ability to carry out their public missions.[20]

We note that " '[t]he ultimate purpose of the [CFCA] is to protect the public fisc.' " (*State of California v. Altus Finance* (2005) 36 Cal.4th 1284, 1297 [32 Cal.Rptr.3d 498, 116 P.3d 1175].) Given that school district finances are largely dependent on and intertwined with state financial aid (see *Belanger v. Madera Unified School Dist.* (9th Cir. 1992) 963 F.2d 248, 251–252 (*Belanger*)), the assessment of double and treble damages, as well as other penalties, to school districts would not advance that purpose.

Of course, where liability otherwise exists, public entities must pay legal judgments from their limited revenues and appropriations, even if they cannot exceed their tax or appropriations ceilings to do so and must therefore cut spending in other areas. (See Gov. Code, § 970 et seq.; *Ventura Group Ventures, Inc. v. Ventura Port Dist.* (2001) 24 Cal.4th 1089, 1098–1100 [104 Cal.Rptr.2d 53, 16 P.3d 717].) This obligation, in and of itself, does not infringe their "sovereign powers." But we may consider the effect on sovereign powers when we are determining whether the Legislature *intended*, by mere implication, to expose a public entity to a particular statutory liability.

For the reasons we have detailed, we conclude the Legislature did not intend to subject financially constrained school districts—or any agency of state or local government—to the treble-damages-plus-penalties provisions

---

[20] By statute, "[n]otwithstanding any other provision of law, a public entity is not liable for damages awarded under [s]ection 3294 of the Civil Code [governing punitive damages] or other damages imposed primarily for the sake of example and by way of punishing the defendant." (Gov. Code, § 818.) One might argue that the CFCA's treble-damage provisions are not strictly, or even primarily, "punitive," in that they are necessary to ensure both (1) full recovery by the state or political subdivision against which the false claim was made and (2) due compensation to the party who undertook the false claim action on behalf of the defrauded entity. (Cf., e.g., *People ex rel. Younger v. Superior Court* (1976) 16 Cal.3d 30 [127 Cal.Rptr. 122, 544 P.2d 1322] [Gov. Code, § 818 did not prohibit assessment, under statute expressly applicable to public entities, of civil penalties against port district for oil spill into estuary; penalties compensated people of state for real, but unquantifiable, damage from spill]; *State Dept. of Corrections v. Workmen's Comp. App. Bd.* (1971) 5 Cal.3d 885 [97 Cal.Rptr. 786, 489 P.2d 818] [Gov. Code, § 818 did not prohibit assessment, under statute expressly applicable to public entities, of 50 percent increase in workers' compensation award otherwise payable by corrections department because of agency's serious and willful misconduct, since employee did not thereby receive more than full compensation for his injuries].) But the purpose behind the statutory ban on punitive damages against public entities—to protect their tax-funded revenues from legal judgments in amounts beyond those strictly necessary to recompense the injured party—applies equally here. In our view, this is an additional indication that the Legislature did not intend, without expressly saying so, to apply the CFCA to public entities such as school districts.

of the CFCA. We conclude that such entities are not "persons" subject to suit under that statute. We disapprove *LeVine v. Weis, supra,* 68 Cal.App.4th 758, and *LeVine v. Weis, supra,* 90 Cal.App.4th 201, to the extent they hold otherwise.

Our analysis is not affected by two United States Supreme Court decisions construing the federal false claims statute (FFCA; 31 U.S.C. § 3729 et seq.)—the model for California's law. In *Stevens, supra,* 529 U.S. 765, the high court majority held that the several *states* (including agencies of state governments) are not "persons" subject to qui tam actions under the FFCA. On the other hand, a different majority later concluded in *Cook County v. United States ex rel. Chandler* (2003) 538 U.S. 119 [155 L.Ed.2d 247, 123 S.Ct. 1239] (*Chandler*) that certain *local* governmental entities, including cities and counties, *are* "persons" subject to such suits.

The parties hotly dispute whether California school districts are "state" agencies. as to which *Stevens* might be persuasive, or local governmental entities that should fall, by analogy, under the rule of *Chandler.* However, we find little in either case of direct relevance to the issue before us. Both decisions construe a federal statute which, in respects material here, is distinct from its California counterpart. Moreover, both cases apply federal principles of statutory construction that differ from those used in this state.

The FFCA was originally adopted in 1863 to confront massive contractor fraud during the Civil War. (*Stevens, supra,* 529 U.S. 765, 781.) As enacted and since amended, the federal statute, like California's, makes "persons" liable for submitting false claims to the government (31 U.S.C. § 3729), but, unlike the California statute, the federal version includes no definition of covered "persons." In *Stevens,* the majority noted that the statute had never indicated it applied to states. Thus, the majority applied a "longstanding interpretive presumption," for purposes of federal law, "that 'person' does not include the sovereign. [Citations.]" (*Stevens, supra,* at p. 780.)

Further, the *Stevens* majority pointed to a separate section of the FFCA—one also with no California parallel—allowing the Attorney General to serve civil investigative demands upon "persons." (31 U.S.C. § 3733(a)(1).) As the majority observed, "persons" were defined, *for purposes of that section,* to include the state (*id.,* § 3733(*l*)(4)), thus suggesting states were excluded for other purposes. (*Stevens, supra,* 529 U.S. 765, 783–784.) The majority also cited a similar federal law, the Program Fraud Civil Remedies Act of 1986 (PFCRA), which was adopted just prior to the substantial 1986 amendments to the federal false claims act, and carried lesser penalties. As the majority noted, the PFCRA contains a definition of "persons" that does not include states. It would be anomalous, the majority concluded, for Congress to subject states—generally considered immune from "punitive" damages—to

the greater false-claims penalties but not the lesser ones provided by the PFCRA. (*Stevens, supra,* at pp. 786–787.)

In *Chandler,* a qui tam plaintiff brought a federal false claims action against the county owner-operator of a hospital, alleging that the hospital submitted falsified compliance documents to obtain federal research funds. The county moved to dismiss, asserting it was not a "person" covered by the FFCA. On authority of *Stevens,* the district court agreed and dismissed the action. The court of appeals reversed, concluding that *Stevens* did not apply to the county. The United States Supreme Court affirmed the court of appeals.

In distinguishing *Stevens,* as had the court of appeals, the *Chandler* majority applied a different presumption of federal statutory construction— one also in effect since the Civil War inception of the FFCA. This presumption, the majority explained, is that, where not specifically defined, the word "person" encompasses "artificial persons" such as "corporations" (*Chandler, supra,* 538 U.S. 119, 125–126), including both "full-fledged municipal corporations," such as towns and cities, that were incorporated at the request of their inhabitants, and "quasi-corporations," such as counties, that were created unilaterally by the state (*id.,* at p. 127, fn. 7).

The *Chandler* majority acknowledged that the 1986 amendments had added treble-damage and penalty provisions to the Civil War-era statute, and also conceded the presumption against subjecting government entities to "punitive" damages. However, the *Chandler* majority observed, there were remedial, nonpunitive aspects to the 1986 damages and penalty provisions. In any event, the majority concluded, given the strong presumption against repeal by implication, the modern addition of arguably "punitive" damages to the FFCA could not be considered a silent reversal of the historical assumption that this statute includes municipalities. (*Chandler, supra,* 538 U.S. 119, 129–134.)

As noted above, when the issue is whether government entities are "persons" covered by a particular statutory scheme, California courts apply interpretive principles somewhat different from those detailed in *Stevens* and *Chandler.* Under California law, absent contrary indicia of legislative intent, statutory "persons" are deemed to include governmental entities, both state and local, unless such inclusion would infringe the entities' exercise of their sovereign powers and duties. California's false claims statute, unlike the federal version, defines covered "persons," and does so in a way that suggests an intent *not* to include government entities. Other indicia of legislative purpose also support this conclusion. And for reasons we have detailed, application of the CFCA's treble-damages-plus-penalties requirement to public school districts would place severe and disproportionate financial constraints on their ability to provide the free education mandated by the

Constitution—a result the Legislature cannot have intended. Nothing in *Stevens* or *Chandler* changes our conclusions in this regard.

Equally beside the point are federal and California decisions holding that California school districts are "arms of the state," and thus enjoy the state's sovereign immunity, under the Eleventh Amendment, from suits in federal court. (E.g., *Belanger, supra*, 963 F.2d 248, 250–251 [civil rights action under 42 U.S.C.A. § 1983]; *Kirchmann v. Lake Elsinore Unified School Dist.* (2000) 83 Cal.App.4th 1098, 1100–1102, 1105–1115 [100 Cal.Rptr.2d 289] [entity with 11th Amend. immunity also enjoys immunity from state court suits under 42 U.S.C. § 1983]; also cf. *U.S. ex rel. Ali v. Daniel, Mann, Johnson* (9th Cir. 2004) 355 F.3d 1140, 1147 [five-pronged "arm of the state" test is appropriate for determining whether government entity enjoys immunity from federal false claims liability under *Stevens*].) When we decide whether the California Legislature intended a California statute to include or exclude California government entities, we are not concerned with issues of federalism, constitutional or statutory.

Nothing in decisions addressing such issues precludes us from holding, for the reasons we have explained, that there was no legislative intent to apply the CFCA to public school districts. We conclude that neither such districts, nor any other agencies of state and local government, are "persons" subject to suit under the CFCA.[21]

### 5. *May charter schools and their operators be sued under the CFCA?*

Though we have disagreed with the Court of Appeal about whether the district defendants are "persons" subject to CFCA actions, we have little

---

[21] The State of California argues that a public school district should be deemed a "person" under the CFCA, and thus liable under that statute for false claims against state education funds, *unless* any CFCA judgment against the district would essentially be paid *from* state funds, in which case the district should be considered an "arm of the state" and thus exempt. Whether a CFCA judgment against a district would be paid from state funds is a case-by-case determination, the state urges, and the instant record lacks information from which we may make such a determination in this case. Hence, the state asserts, a remand to the trial court is required. We are not persuaded. Under the revenue equalization system of California school finance, any judgment finding the district liable for a false claim against state funds will necessarily be paid, at least in part, from funds originally derived from the state. Indeed, the district defendants have urged that there is no purpose in holding them to CFCA liability in this regard, because the district's satisfaction of a CFCA judgment would, in effect, constitute "the state paying itself." We need not immerse ourselves in this thicket. For the reasons we have explained, we are satisfied that the Legislature did not intend to impair districts' financial ability to carry out their public educational mission on behalf of the state by exposing them to the harsh monetary sanctions of the CFCA.

Finally, the analysis we have adopted makes it unnecessary to reach the district defendants' claims that they are immune from liability under various provisions of the TCA. (Gov. Code, § 815 et seq.)

difficulty upholding the Court of Appeal's determination that the charter school defendants *are* "persons" who may be liable under the CFCA.[22]

The CFCA expressly defines "persons" to include "corporations" and "limited liability companies," as well as, among other things, "organizations" and "associations." (Gov. Code, § 12650, subd. (b)(5).) The statute includes no exemption, either in the definitional section or elsewhere, for "corporations" organized under the Nonprofit Public Benefit Corporation Law (Corp. Code, § 5110), or for "corporations," "limited liability companies," "organizations," or "associations" that operate charter schools under the CSA.

The instant complaint alleges, and apparently there is no dispute, that defendants One2One, CSRA, Sierra Summit Academy, and Camptonville Academy are corporations. Moreover, Mattole Valley School, though apparently not itself a corporation, is alleged to be operated by corporations, and is certainly an "organization" within the meaning of the statutory definition.

Nonetheless, the charter school defendants insist that, by virtue of the CSA, they are entitled to any "public entity" immunity enjoyed by their chartering districts. The charter school defendants point to various declarations in the CSA that charter schools are "part of the Public School System, as defined in [a]rticle IX of the California Constitution" (Ed. Code, § 47615, subd. (a)(1)),[23] are "under the jurisdiction of the Public School System and the exclusive control of the officers of the public schools" (*id.*, subd. (a)(2)), and, for specified purposes of funding, are "deemed to be . . . 'school district[s]' " (*id.*, § 47612, subd. (c); see also *id.*, § 47650).[24]

■ We are not persuaded. Though charter schools are deemed part of the system of public schools for purposes of academics and state funding

---

[22] As indicated above, the charter school defendants, as so labeled for purposes of this opinion, include the schools themselves, in whatever legal form they are operated, as well as all other entities having legal form, other than the district defendants, which entities are named in the complaint as having direct or indirect responsibility for, or control of, the operation of such schools.

[23] Article IX, section 6 of the California Constitution defines the public school system to "include all kindergarten schools, elementary schools, secondary schools, technical schools, and State colleges, established in accordance with law and, in addition, the school districts and the other agencies authorized to maintain them."

[24] Education Code section 47612, subdivision (c), states that charter schools are deemed to be school districts for purposes of (1) Education Code sections 14000 through 14058 (concerning appropriations, disbursements, and apportionment from the state school fund to local districts based on ADA), 41301 (concerning apportionment formulas based on ADA), 41302.5 (defining "school districts" for purposes of art. XVI, §§ 8 & 8.5, of the California Constitution, which sections earmark levels of state funding for public schools), 41850 through 41857 (concerning apportionment from the state school fund for home-to-school transportation), and 47638 (concerning charter schools' eligibility for state lottery funds based on ADA), and (2) article XVI, sections 8 and 8.5 of the California Constitution.

eligibility, and are subject to some oversight by public school officials (see *Wilson, supra,* 75 Cal.App.4th 1125, 1136–1142), the charter schools here are *operated,* not by the public school system, but by distinct outside entities— which the parties characterize as nonprofit corporations—that are given substantial freedom to achieve academic results free of interference by the public educational bureaucracy. The sole relationship between the charter school operators and the chartering districts in this case is through the charters governing the schools' operation. Except in specified respects, charter schools and their operators are "exempt from the laws governing school districts." (Ed. Code, § 47610.)

The autonomy, and independent responsibility, of charter school operators extend, in considerable degree, to financial matters. Thus, where a charter school is operated by a nonprofit public benefit corporation, the chartering authority is not liable for the school's debts and obligations. (Ed. Code, § 47604, subd. (c).) A 2003 amendment to the CSA makes clear that the chartering authority's immunity from financial liability for a charter school extends to "claims arising from the performance of acts, errors, or omissions by the . . . school, if the authority has complied with all oversight responsibilities required by law." (Ed. Code, § 47604, subd. (c).)

██ The CFCA was designed to help the government recover public funds of which it was defrauded by outside entities with which it deals. There can be little doubt the CFCA applies generally to nongovernmental entities that contract with state and local governments to provide services on their behalf. The statutory purpose is equally served by applying the CFCA to the independent corporations that receive public monies under the CSA to operate the schools at issue here on behalf of the public education system.

On the other hand, we conclude, the sovereign power over public education is not infringed by application of the CFCA, including its treble-damages-plus-penalties provisions, to the charter school operators in this case. As we have seen, public school *districts* are the entities fundamentally responsible for operating the system of free public education required by the Constitution. The *districts'* continuing financial ability to carry out this mission at basic levels of adequacy is thus critical to satisfying the state's free public school obligation. (See *Butt, supra,* 4 Cal.4th 668, 678–692.) Accordingly, we have concluded that the Legislature did not intend to undermine this sovereign obligation by exposing public school *districts* to the harsh monetary sanctions of the CFCA.

██ But the CSA assigns no similar sovereign significance to charter schools or their operators. Under that statute, the term of a charter cannot

exceed five years, subject to renewal. (Ed. Code, § 47607, subd. (a)(1).) The grant and renewal of charters are dependent upon satisfaction of statutory requirements, including attainment of specific educational goals. (*Id.*, subds. (b), (c); see also *id.*, § 47605.) A charter may be revoked for material violations of the law or charter, failure to meet pupil achievement goals, or fiscal mismanagement. (*Id.*, § 47607, subd. (d).) If a charter school ceases to exist, its pupils are reabsorbed into the district's mainstream public schools, and the ADA revenues previously allotted to the charter school for those pupils revert to the district.

The CSA was adopted to widen the range of educational choices available within the public school system. That is a salutary policy. Yet application of the CFCA's monetary remedies, however harsh, to the charter school defendants presents no fundamental threat to maintenance, within the affected districts, of basically adequate free public educational services. Thus, application of the CFCA to the charter school operators in this case cannot be said to infringe the exercise of the sovereign power over public education.

This being so, there is no reason to conclude that the charter school defendants are not "persons" within the definition expressly set forth in the CFCA. In our view, they are such "persons," and they may be held liable under the terms of that statute if they submit false claims for state or district educational funds.[25]

---

[25] Defendants Camptonville Academy and Jablecki insist that application of the CFCA to charter schools and their operators would violate constitutional and statutory mandates that state school funds be separately apportioned and maintained. (Citing Cal. Const., art. XVI, § 8, subd. (a) ["From all state revenues there shall first be set apart the moneys to be applied by the state for support of the public school system"]; see also *id.*, § 8.5 [referring to this separate fund as the State School Fund]; Ed. Code, § 14040 [State Controller shall keep separate account of State School Fund].) This would require, these defendants assert, that money falsely received from the State School Fund must revert to that account alone when recovered from the false claimant. Yet, they observe, the CFCA provides, in subdivision (j) of Government Code section 12652, that "[p]roceeds from the action or settlement of [a CFCA] claim by the Attorney General" shall be deposited into a *different* fund, the False Claims Act Fund created by the same subdivision, and shall be used by the Attorney General, upon appropriation by the Legislature, for ongoing investigation and prosecution of false claims. We are not persuaded by this hypertechnical argument. Even assuming that the premise advanced by these defendants is correct (i.e., funds falsely received from the State School Fund must revert only to that fund), subdivision (j), reasonably read, does not provide otherwise. As noted, the CFCA specifies recovery of *double or triple* the amount falsely received. (Gov. Code, § 12651, subds. (a), (b).) From this total amount, the Attorney General, local prosecuting authority, and/or qui tam plaintiff, receive percentage "cuts" (*id.*, § 12652, subd. (g)(1)–(5)), with the remainder "revert[ing] to the state [or] the political subdivision" (*id.*, subd. (g)(6)). Elsewhere than in subdivision (j), section 12652 makes clear that the Attorney General, or a local prosecuting authority, is to use *that officer's "cut"* of the proceeds for ongoing investigation and prosecution of false claims. (*Id.*, subd. (g)(1)(A), (B), (2).) In this context, subdivision (j), when referring to "[p]roceeds from the action or settlement of the claim by the Attorney General," means *only*

### 6. *May charter schools and their operators be sued under the UCL?*

The Court of Appeal determined that the charter school defendants are *not* "persons" subject to suit under the UCL. But reasons similar to those applicable under the CFCA persuade us the Court of Appeal erred in this respect.

In language similar to the CFCA's, the UCL defines "persons" subject to that law to "mean and include natural persons, corporations, firms, partnerships, joint stock companies, associations and other organizations of persons." (Bus. & Prof. Code, § 17201.) The charter school defendants either are, or are operated by, corporations, and they also constitute "associations" or "organizations." They are within the plain meaning of the statute.

Noting that several cases have held government entities are not "persons" who may be sued under the UCL (e.g., *Community Memorial Hospital v. County of Ventura* (1996) 50 Cal.App.4th 199, 209 [56 Cal.Rptr.2d 732] (*Community Memorial*); see also *People for Ethical Treatment of Animals, Inc. v. California Milk Producers Advisory Bd.* (2005) 125 Cal.App.4th 871, 877–883 [22 Cal.Rptr.3d 900]; *California Medical Assn. v. Regents of University of California* (2000) 79 Cal.App.4th 542, 551 [94 Cal.Rptr.2d 194]; *Trinkle v. California State Lottery* (1999) 71 Cal.App.4th 1198, 1203–1204 [84 Cal.Rptr.2d 496]; *Janis v. California State Lottery Com.* (1998) 68 Cal.App.4th 824, 831 [80 Cal.Rptr.2d 549]; *Santa Monica Rent Control Bd. v. Bluvshtein* (1991) 230 Cal.App.3d 308, 318 [281 Cal.Rptr. 298]; but see *Notrica v. State Comp. Ins. Fund* (1999) 70 Cal.App.4th 911, 939–945 [83 Cal.Rptr.2d 89]), the charter school defendants insist they are entitled, as part of the public school system, to this "public entity" exemption.[26] The Court of Appeal agreed. We do not.

As we have indicated, the charter schools here are operated, pursuant to the CSA, by corporations that, for purposes of the CFCA, do not qualify as public entities. Though, by statutory mandate, these institutions are an alternative form of public schools financed by public education funds, they and their operators are largely free and independent of management and oversight by the public education bureaucracy. Indeed, the charter schools

---

the Attorney General's "cut" of the total amount recovered in the action or settlement, leaving the remainder for reversion to the public fund, treasury, or account—general or specific—from which it was falsely obtained. In providing for double or treble recovery, the CFCA seeks to ensure that the "cuts" awarded to the public or private parties who prosecute false claims actions will not prevent the defrauded treasury itself from obtaining full recovery of the funds actually lost to the false claim. We see in this scheme no violation of the constitutional and statutory provisions cited by Camptonville Academy and Jablecki.

[26] Plaintiffs made no UCL claim against the school district defendants. Hence, whether governmental entities, as such, are "persons" covered by the UCL is not at issue in this appeal.

compete with traditional public schools for students, and they receive funding based on the number of students they recruit and retain at the expense of the traditional system. Insofar as their operators use deceptive business practices to further these efforts, the purposes of the UCL are served by subjecting them to the provisions of that statute.

Nor is the state's sovereign educational function thereby undermined. Even if governmental entities, in the exercise of their sovereign functions, are exempt from the UCL's restrictions on their competitive practices (see *Community Memorial, supra,* 50 Cal.App.4th 199, 209–211 [county was not "person" for purposes of UCL, such that county hospital's treatment of paying patients in competition with private hospitals would be subject to statute]), no reason appears to apply that principle to the charter school defendants, which are covered by the plain terms of the statute and which compete with the traditional public schools for students and funding. We conclude that the charter school defendants are "persons" covered by the UCL.[27]

> 7. *Did statutory restrictions on independent study programs apply to charter schools before Education Code section 51747.3 was amended in 1999?*

The Court of Appeal agreed with the trial court that plaintiffs may not pursue, as part of their CFCA cause of action, allegations that the charter school defendants claimed ADA funding in violation of the "independent study" requirements of Education Code section 51747.3. The appellate court reasoned that section 51747.3 applied to charter schools only after a 1999 amendment, effective in 2000, and that all the pertinent allegations of the complaint preceded this effective date. We conclude, contrary to the Court of Appeal, that section 51747.3, *as in effect before 2000,* did include charter schools. Our analysis proceeds against the following backdrop.

 In 1989, article 5.5 (§ 51745 et seq.), dealing with independent study programs, was added to title 2, part 28, division 4, chapter 5 of the Education Code. (Stats. 1989, ch. 1089, § 5, p. 3775.)[28] Section 51745, subdivision (a), provides that, beginning with the 1990–1991 school year, local school districts may offer independent study programs "to meet the educational needs of pupils in accordance with the requirements of this article."

Three years later, in 1992, the Legislature enacted the CSA. One section of that law, Education Code section 47610, provided that a charter school must

---

[27] We do not, however, decide whether the particular allegations of plaintiffs' complaint state a cause of action under the UCL. That issue is beyond the scope of this appeal.

[28] A former article 5.5, also dealing with independent study, was simultaneously repealed. (Stats. 1989, ch. 1089, § 4, p. 3775.)

comply with its charter, but was "otherwise exempt from the laws governing school districts, except as specified in [s]ection 47611 [dealing with participation in the State Teacher's Retirement System]." (Stats. 1992, ch. 781, § 1, pp. 3756, 3760.) Since its inception, the CSA has further stated that, with specified exceptions, "[a]dmission to a charter school shall not be determined according to the place of residence of the pupil, or of his or her parent or guardian, within this state." (Ed. Code, § 47605, subd. (d)(1).)

In 1993, Education Code section 51747.3 was added to the independent study provisions. (Stats. 1993, ch. 66, § 32, p. 923.) As then enacted, section 51747.3 provided that "[n]o local educational agency may claim state funding for the independent study of a pupil . . . if the agency has provided *any funds or other thing of value* to the pupil or his or her parent or guardian that the agency does not provide to students who attend regular classes or to their parents or guardians." (Stats. 1993, ch. 66, § 32, p. 923, adding Ed. Code, § 51747.3, subd. (a), italics added.) Further, the new statute specified that "[*n*]*otwithstanding any other provision of law*, . . . independent study average daily attendance shall be claimed by school districts and county superintendents of schools only for pupils who are re*sidents of the county in which the apportionment claim is reported,* or . . . of a county *immediately adjacent* to [such] county . . . ." (*Ibid.,* adding § 51747.3, subd. (b), italics added.) Finally, the statute stated that "[t]he provisions of this section are not subject to waiver by the State Board of Education, by the State Superintendent of Public Instruction, *or under any provision of Part 26.8 [of the Education Code] (commencing with [s]ection 47600)* [i.e., the CSA]." (*Ibid.,* adding § 51747.3, subd. (d), italics added.)

A 1995 Attorney General's opinion concluded that Education Code section 51747.3's restrictions on the provision of special "funds or other thing[s] of value" to independent study pupils applied to charter schools. The opinion observed that although, in section 47610, the CSA purported to exempt charter schools from all but a few specified school district laws, subdivision (d) of section 51747.3 expressly provided that the provisions of *that* statute could *not* be waived under the CSA.

As the opinion indicated, "[w]hatever may comprise the 'laws governing school districts' from which charter schools are exempt, it is clear that for purposes of the state funding of independent study programs, a charter school must comply with the particular requirements of [Education Code] section 51747.3. The last sentence of subdivision (d) of section 51747.3 would otherwise be devoid of meaning, contrary to the rule of statutory construction

that every word, phrase, sentence, and part of a statute must be accorded significance if reasonably possible. [Citations.]" (78 Ops.Cal.Atty.Gen. 253, 257–258 (1995).)[29]

In 1996, the Legislature amended Education Code section 47610, part of the CSA, to add certain additional statutes to the list of laws from which charter schools, in derogation of the general rule, were *not* exempt. (Stats. 1996, ch. 786, § 5, p. 4148.) Section 51747.3 was not included.

In this setting, the Legislature amended Education Code section 51747.3 in 1999. (Stats. 1999, ch. 162, § 2.) As amended in 1999, subdivision (a) of section 51747.3 specifies that "[n]otwithstanding any other provision of law," "charter schools" are among the "local educational agencies" barred from claiming state funding for pupils who have received "funds or other thing[s] of value" not provided to regular classroom students. (Stats. 1999, ch. 162, § 2.) A new sentence in subdivision (a) further declares that "[a] charter school may not claim state funding for the independent study of a pupil . . . if the charter school has provided any funds or other thing of value to the pupil or his or her parent or guardian that a school district could not legally provide to a similarly situated pupil of the school district, or to his or her parent or guardian." In subdivision (b), the amendment added "charter schools" to "school districts" and "county superintendents of schools" as entities ineligible to claim state apportionment funds for independent study pupils who reside outside the county from which the apportionment claim is reported, or an adjacent county. (Stats. 1999, ch. 162, § 2.)[30]

---

[29] The opinion concluded, however, that the "things of value" referred to in Education Code section 51747.3, subdivision (a), did not include special educational materials, such as laptop computers and other learning aids, for the purpose of facilitating independent study in particular. Noting that the resources necessary for independent study are inherently different from those appropriate to the classroom setting, the opinion concluded that "[s]ection 51747.3 may not be construed as limiting the educational resources of an independent study program expressly intended by the Legislature" to expand educational choices and opportunities. (78 Ops.Cal.Atty.Gen., *supra*, at pp. 259–260.) Such a result, the opinion asserted, would be "absurd." (*Id.*, at p. 260.) The statute's legislative history, the opinion observed, revealed "[n]othing [to] suggest that educational resources are to be withheld from students in an independent study program under the circumstances presented. Rather, the language of section 51747.3, subdivision (a), was adopted to prevent schools from offering 'sign up bonuses' to the parents of home study children in order for the schools to obtain state funding for the attendance of the children in their independent study programs. The prohibition was intended to prevent schools from offering incentives unrelated to education, not to preclude schools from spending funds on special educational aids and materials for independent study students." (78 Ops.Cal.Atty.Gen., *supra*, at p. 260.)

[30] As amended in 1999, Education Code section 51747.3 read, in pertinent part, as follows (added language in italics, omissions noted by brackets): "(a) [No] *Notwithstanding any other provision of law, a* local education agency, *including, but not limited to, a charter school,* may *not* claim state funding for the independent study of a pupil . . . if the agency has provided any funds or other thing of value to the pupil or his or her parent or guardian that the agency does

The Legislative Counsel's Digest for Senate Bill No. 434 (1999–2000 Reg. Sess.) (Senate Bill No. 434), which incorporated the 1999 amendment to Education Code section 51747.3, stated that the amendment (1) "would make . . . applicable to charter schools" the preexisting statutory restriction on ADA funding for independent study students who have received money or things of value not provided to traditional classroom students, (2) "would apply . . . also to charter schools" the preexisting ban on ADA funding for independent study students who live outside the county in which funding is sought, or an adjacent county, and (3) would additionally prevent charter schools from receiving ADA funding for independent study pupils to whom they provided money or things of value which a school district could not legally provide to similarly situated students.

In concluding that the 1999 amendment extended Education Code section 51747.3 to charter schools for the first time, the Court of Appeal cited (1) the CSA's express exemption of charter schools from all but a few specified provisions governing school districts, (2) the express CSA provision that charter school enrollment cannot be limited by residence, (3) the 1999 amendment's express addition of charter schools to the entities subject to section 51747.3, and (4) the Legislative Counsel's Digest quoted above. The concurring and dissenting opinion applies a similar analysis. But that approach overlooks language section 51747.3 has contained since its adoption in 1993—i.e., that its provisions *are not subject to waiver under the CSA.*

As the Attorney General observed in his 1995 opinion, the only possible meaning of this language is that, from and after the effective date of the 1993 enactment, charter schools were, and remain, subject to the statutory restrictions on independent study programs then set forth in that law. Any other conclusion would deprive this phrase of significance, contrary to the principle of statutory construction that interpretations which render any part of a statute superfluous are to be avoided. (E.g., *In re Young* (2004) 32 Cal.4th 900, 907 [12 Cal.Rptr.3d 48, 87 P.3d 797]; *Hunt v. Superior Court* (1999) 21 Cal.4th

---

not provide to pupils who attend regular classes or to their parents or guardians. *A charter school may not claim state funding for the independent study of a pupil . . . if the charter school has provided any funds or other thing of value to the pupil or his or her parent or guardian that a school district could not legally provide to a similarly situated pupil of the school district, or to his or her parent or guardian.* [¶] (b) Notwithstanding *paragraph (1) of subdivision (d) of Section 47605 or* any other provision of law, community school and independent study average daily attendance shall be claimed by school districts, [and] county superintendents of schools, *and charter schools* only for pupils who are residents of the county in which the apportionment claim is reported, or who are residents of a county immediately adjacent to the county in which the apportionment claim is reported. [¶] . . . [¶] (d) . . . The provisions of this section are not subject to waiver by the State Board of Education, by the State Superintendent of Public Instruction, or under any provision of Part 26.8 (commencing with Section 47600)." (Stats. 1999, ch. 162, § 2.) A 2003 amendment substituted "educational" for "education" between "local" and "agency." (Stats. 2003, ch. 529, § 4.)

984, 1002 [90 Cal.Rptr.2d 236, 987 P.2d 705]; *People v. Aguilar* (1997) 16 Cal.4th 1023, 1030 [68 Cal.Rptr.2d 655, 945 P.2d 1204].)

 This construction of Education Code section 51747.3 does not overlook certain provisions of the CSA, noted by the Court of Appeal, and by the concurring and dissenting opinion, which were already in effect in 1993, including sections 47605 (eligibility for enrollment in particular charter school not to be determined by residence) and 47610 (charter school exempt from laws governing school districts except as expressly provided). In harmonizing the disparate, and sometimes discordant, statutory provisions, we are guided by the maxim that, where statutes are otherwise irreconcilable, later and more specific enactments prevail, pro tanto, over earlier and more general ones. (See, e.g., *Pacific Lumber Co. v. State Water Resources Control Bd.* (2006) 37 Cal.4th 921, 942–943 [38 Cal.Rptr.3d 220, 126 P.3d 1040] (*Pacific Lumber*); *Stop Youth Addiction, Inc. v. Lucky Stores, Inc.* (1998) 17 Cal.4th 553, 568 [71 Cal.Rptr.2d 731, 950 P.2d 1086]; *Department of Alcoholic Beverage Control v. Alcoholic Beverage Control Appeals Bd.* (1999) 71 Cal.App.4th 1518, 1524 [84 Cal.Rptr.2d 621].)

 Applying those principles, we conclude that the 1993 version of Education Code section 51747.3, including its provision for nonwaiver under the CSA, is a more recent and specific enactment on the subjects it addresses than the pertinent provisions of sections 47605 and 47610. The latter statutes, enacted in 1992, provided generally that charter schools were exempt from most school district laws and must accept nonresident students. But section 51747.3 later placed restrictions, including residence restrictions, on the circumstances under which charter schools, like other public schools, could obtain ADA funding for independent study programs and pupils in particular. To that extent, section 51747.3 superseded the earlier statutes. Indeed, section 51747.3 has always expressly provided that its residency restrictions apply notwithstanding any other provision of law. (*Id.*, subd. (b).)[31]

We are not persuaded otherwise by the 1996 amendment to Education Code section 47610, which added certain statutes to the list of laws from which charter schools are *not* exempt, but did not include section 51747.3. Section 51747.3, by its express terms, already applied to charter schools. There was no need to say so again in section 47610.

---

[31] We have found nothing in the contemporaneous legislative history of Senate Bill No. 399 (1993–1994 Reg. Sess.), through which Education Code section 51747.3 was first adopted, that adds or detracts from the conclusion that the section was intended, from its inception, to apply to charter schools.

Nor are we dissuaded by the language, the Legislative Counsel's Digest, or the legislative history[32] of the 1999 amendment to Education Code section 51747.3, insofar as they might suggest the 1999 Legislature believed charter schools were being added to the statute for the first time. A later expression of legislative purpose is not binding as to what prior legislation meant when it was adopted. (E.g., *Pacific Lumber, supra*, 37 Cal.4th 921, 940; *Cummins, Inc. v. Superior Court* (2005) 36 Cal.4th 478, 492 [30 Cal.Rptr.3d 823, 115 P.3d 98].) We therefore conclude that the restrictions on independent study programs set forth in the 1993 version of Education Code section 51747.3 applied to charter schools even prior to the 1999 amendment.[33]

■ Plaintiffs' CFCA cause of action appears properly tailored to the pre-1999 version of the statute. The complaint alleges that the charter school defendants submitted false ADA claims for independent study pupils who (1) received "funds or other thing[s] of value" not provided to classroom students, and (2) resided outside the counties designated by the statute. The trial court and the Court of Appeal thus erred in holding that plaintiffs' "independent study" claims were barred because Education Code section 51747.3 did not apply to charter schools until it was amended in 1999.[34]

---

[32] See, e.g., the Senate Education Committee's analysis of Senate Bill No. 434 as amended June 28, 1999, pages 1–2.

[33] As originally adopted in 1993, Education Code section 51747.3 referred to "local education agenc[ies]," "school districts," and "county superintendents of schools," but not specifically to charter schools, as entities precluded from *claiming state funds* for independent-study pupils under the circumstances described in the statute. (Stats. 1993, ch. 66, pp. 904, 923.) However, nothing in the 1993 version of the section indicated that these provisions, as in effect prior to 2000, did not apply equally to the independent-study *pupils* of charter schools operating under the jurisdiction of the "local education agencies," "school districts," and "county superintendents of schools" *responsible* for claiming state funds on behalf of such schools. In 1999, section 51747.3 was amended, among other things, expressly to include charter schools among the "local education agencies" covered by the section, and to place charter schools within the statute's limitations on claiming state funds for independent-study pupils. (Stats. 1999, ch. 162, § 2.) But it appears this express statement of limitations on charter schools' ability to *claim state funding* was simply part of a contemporaneous overhaul of the way charter schools were funded in general. Another 1999 measure, Assembly Bill No. 1115 (1999–2000 Reg. Sess.) (Assembly Bill No. 1115)—a trailer to the 1999 Budget Bill—added section 47651, providing that a charter school may elect to receive its share of state funding *directly*, rather than through the "local educational agency" under which it operates. (Stats. 1999, ch. 78, § 32.8.) The legislative history of Senate Bill No. 434, by which section 51747.3 was amended, made specific reference to the change in funding methodology adopted in Assembly Bill No. 1115. (See Sen. Com. on Education, analysis of Sen. Bill No. 434, as amended June 28, 1999, p. 4.) Under these circumstances, it became logical for section 51747.3 to mention charter schools directly as *claimants of state funds*. In sum, we are not persuaded that either the pre-1999 version of section 51747.3, or the 1999 amendments to that section, evidence the Legislature's intent to *exclude* charter schools, prior to 2000, from this statute's funding restrictions on independent-study programs.

[34] We realize the 1999 amendment to Education Code section 51747.3 did not simply insert "charter schools" as entities subject to the 1993 version of the statute. The amendment also

8. *Is plaintiffs' CFCA claim barred as one for "educational malfeasance"?*

The complaint alleges that the charter school defendants submitted false claims to obtain ADA funds for pupils who "were not [actually] students enrolled in and receiving instruction, educational materials, or services from [defendants'] schools." As noted above, the gravamen of this claim is that, in the operation of their distance learning schools, defendants did little more than collect attendance forms from their ostensible pupils, while failing to provide the educational services, equipment, and supplies promised in the schools' charters and promotional materials, and required by law. Among other things, the complaint asserts that defendants overcharged for educational software readily available from other sources, never furnished promised computers for online learning and testing at home, and failed to provide the services of "educational facilitators" who, for each student, were supposed to order necessary equipment and supplies, develop an individualized curriculum plan, and make weekly home visits for personal instruction, testing, and evaluation.

The trial court concluded that these were all impermissible claims for "educational malfeasance" (see *Peter W., supra*, 60 Cal.App.3d 814), but the Court of Appeal disagreed. The Court of Appeal reasoned that the complaint's allegations required no judgments about the methodology or quality of defendants' educational services—a matter upon which reasonable persons could disagree. Rather, the appellate court observed, the complaint presented only the "straightforward and comprehensible" claim that defendants defrauded the state by collecting public education funds for pupils to whom they provided *no* service beyond the timely collection of attendance forms.

We agree in principle with the Court of Appeal. Insofar as the complaint alleges, not that defendants provided a *substandard* education, but instead that they (1) offered *no* significant educational services, (2) did, or failed to do, specific, quantifiable acts in violation of their charters or applicable law, or

---

added that "[a] charter school may not claim state funding for the independent study of a pupil, whether characterized as home study or otherwise, if the charter school has provided any funds or other thing of value to the pupil or his or her parent or guardian *that a school district could not legally provide to a similarly situated pupil of the school district, or to his or her parent or guardian.*" (Stats. 1999, ch. 162, § 2, italics added.) This new sentence may apply restrictions to charter school independent study programs beyond those imposed by the original version of the statute. We need not address that issue, however, because plaintiffs' complaint is not framed in the terms of this amended language. Moreover, we need not consider whether special educational materials may be provided to independent study pupils, though not to classroom students, without violating the "funds or other thing[s] of value" proscription in the *original* version of the statute, as suggested by the 1995 Attorney General's opinion. That question is beyond the scope of the issues presented by this appeal.

(3) improperly caused students, parents, or guardians to incur monetary charges or overcharges for particular educational materials and equipment supplied by or through defendants, it does not state a barred claim for educational malfeasance. We explain our reasoning in detail.

In *Peter W., supra,* 60 Cal.App.3d 814, an 18-year-old former public school student sued his school district, asserting causes of action for negligence, breach of mandatory duty, and fraud. The complaint alleged as follows: The district "negligently and carelessly" failed to perceive the plaintiff's learning disabilities, assigned him to classes beyond his reading abilities with instructors unqualified to meet his special needs, passed him from grade to grade with knowledge that he had not achieved necessary skills, and permitted him, in violation of state law, to graduate even though he could not read above the eighth grade level. During this time, the district made representations to the plaintiff's mother, which representations the district knew were false or had no basis to believe were true, that he was performing at or near his grade level. As a result, he graduated with fifth grade reading and writing skills, thus permanently limiting his employment opportunities and earning capacity.

The defendant's demurrer was sustained, the suit was dismissed, and the plaintiff appealed. The Court of Appeal affirmed. The court concluded that the complaint failed to allege the district's breach of a duty the law would recognize. As the court noted, "classroom methodology affords no readily acceptable standards of care, or cause, or injury." Pedagogical science, the court observed, is "fraught with different and conflicting theories" about how children should be taught; moreover, educational success or failure "are influenced by a host of factors," both personal and external, "which affect the pupil subjectively" and often are beyond the control of educators. (*Peter W., supra,* 60 Cal.App.3d 814, 824.) "We find in this situation," said the court, "no conceivable 'workability of a rule of care' against which defendants' alleged conduct may be measured [citation], no reasonable 'degree of certainty that . . . plaintiff suffered injury' within the meaning of the law of negligence [citation], and no such perceptible 'connection between the defendant's conduct and the injury suffered,' as alleged, which would establish a causal link between them within the same meaning [citation]." (*Id.,* at p. 825.)

*Peter W.* also identified other public policy considerations, "even more important in practical terms," that counsel against an "actionable 'duty of care' in persons and agencies who administer the academic phases of the public educational process." (*Peter W., supra,* 60 Cal.App.3d 814, 825.) The opinion noted that the public schools are "already beset by social and financial problems," including widespread dissatisfaction with their academic

performance, and are subject to "the limitations imposed upon them by their publicly supported budgets." (*Ibid.*) Subjecting such institutions to an academic duty of care under these circumstances, the opinion concluded, "would expose them to the tort claims—real or imagined—of disaffected students and parents in countless numbers. . . . The ultimate consequences, in terms of public time and money, would burden them—and society—beyond calculation." (*Ibid.*)

As the instant Court of Appeal made clear, however, the considerations identified in *Peter W.* that preclude an action for personal educational injury based on inherently subjective standards of duty and causation do not apply to a claim that school operators fraudulently sought and obtained public education funds for doing nothing more than collecting attendance forms. Resolution of such a claim does not require judgments about pedagogical methods or the quality of the school's classes, instructors, curriculum, textbooks, or learning aids. Nor does it require evaluation of individual students' educational progress or achievement, or the reasons for their success or failure. It simply obliges the court to determine whether the operator offered *any* significant teaching, testing, curriculum oversight, and educational resources to ostensible students.

Similarly, nothing in the rationale of *Peter W.* precludes a claim that a school operator's claim on state funds was "false" insofar as the school committed objectively identifiable breaches of its charter, applicable state law, or promises it made to induce enrollment. For example, *Peter W.* does not bar assertions that a school operator failed to provide promised equipment and supplies, used teachers who lacked necessary credentials, violated specific rules governing "independent study" programs, or caused students, parents, or guardians to incur improper fees or charges,[35] so long as such claims do not challenge the *educational quality or results* of the school's programs.[36]

---

[35] Indeed, we have routinely addressed claims that public schools wrongly charged students, parents, or guardians for school-related activities or services, without any suggestion that such issues implicated the "educational malfeasance" doctrine. (E.g., *Salazar v. Eastin* (1995) 9 Cal.4th 836 [39 Cal.Rptr.2d 21, 890 P.2d 43] [taxpayer suit challenging charges for transportation of students to and from school]; *Hartzell v. Connell* (1985) 35 Cal.3d 899 [201 Cal.Rptr. 601, 679 P.2d 35] [parent/taxpayer suit challenging school fees for extracurricular activities].)

[36] We emphasize that our discussion here is limited to whether such theories are barred under *Peter W.* as claims for "educational malfeasance." We express no view on whether such allegations can form the basis for a cause of action *under the CFCA.* In other words, we do not address whether a charter school's breaches of promises to students, parents, or guardians, or its violations of its charter or applicable law, may cause any related funding claims the school makes upon the state to be "false" within the meaning of that statute. Nor, of course, do we concern ourselves with the possibility that plaintiffs have pled factually inconsistent CFCA theories by alleging, on the one hand, that the charter school defendants failed to deliver educational equipment and supplies and, on the other, that they violated the "independent

For the most part, plaintiffs' CFCA allegations, detailed above, conform to these principles, and thus avoid preclusion under *Peter W.* As the Court of Appeal held, the trial court thus erred in concluding that the CFCA cause of action was wholly barred as a claim for "educational malfeasance." We note, however, a single passage of the complaint which alleges that One2One "fails to provide the education it promises but falsely collects State educational funds as if the education were provided." Insofar as this particular allegation seeks to raise issues of the *quality* of education offered by the charter school defendants, or of the academic *results* produced, we believe it falls within the rule that courts will not entertain claims of "educational malfeasance." To that extent, therefore, the allegation is not actionable.

### 9. Did the CFCA cause of action against the charter school defendants require prior presentment of a claim under the TCA?

The TCA states that, with specified exceptions, all "claims for money or damages" against the state or "local public entities" must be "presented" in accordance with that law. (Gov. Code, §§ 905, 905.2.) Except as otherwise provided, no suit for money or damages may be brought against a public entity until such a claim has been presented to the entity and acted upon or deemed rejected. (*Id.*, § 945.4.) The claim must be presented within six months of accrual of the cause of action (*id.*, § 911.4), but the claimant may apply to the public entity for leave to present a late claim (*id.*, § 911.6). If such an application is denied, or deemed denied, the claimant may petition the court for relief from the claim presentment requirement. (*Id.*, § 946.6.)

Plaintiffs' complaint pleads that they "have presented claims for money or damages to the public entity defendants pursuant to the requirements of Government Code [section] 945.4, which have been denied, *and/or* have sought relief from the claims presentment requirements." (Italics added.) Plaintiffs concede that this pleading does not allege actual compliance with the TCA claim presentment requirements, and that they have not so complied. They urge no such compliance is necessary for purposes of the CFCA. The Court of Appeal concurred. We agree with the Court of Appeal.

At the outset, we need not decide whether the TCA's claim presentment requirements apply to plaintiffs' CFCA claims against the *district defendants*, because we have concluded that those defendants are not "persons" subject to suit under the CFCA. (See discussion, *ante.*) On the other hand, the question arises whether the claim presentment provisions of the TCA could ever apply to the *charter school* defendants.

---

study" rules by providing things of value not offered to classroom students. Such issues were not addressed on demurrer and are beyond the scope of this appeal.

Under that law, claims must be presented to "the state" (Gov. Code, § 905.2) or "local public entities" (*id.*, § 905). For purposes of the TCA, " '[l]ocal public entity' includes a county, city, district, public authority, public agency, and any other political subdivision or public corporation in the [s]tate, but does not include the [s]tate." (Gov. Code, § 900.4.) Under the CSA, charter schools are part of the public school system and, for specified purposes, are deemed to be school districts. (See discussion, *ante.*) However, those purposes do not expressly include coverage by the TCA and, for reasons previously discussed in connection with the CFCA, the charter school defendants do not fit comfortably within any of the categories defined, for purposes of the TCA, as "local public entities."

 In any event, as the Court of Appeal concluded, application of the TCA's claim presentment requirement to CFCA actions would frustrate the purposes of both statutes. The TCA itself expressly excludes from the claim presentment requirement "[c]laims by the [s]tate or by a state department or agency or by another local public entity." (Gov. Code, § 905, subd. (i).) Hence, CFCA actions brought, in their official capacities, by the Attorney General (Gov. Code § 12652, subd. (a)) or local prosecuting authorities (*id.*, subd. (b)) clearly are exempt.

The same rule appears applicable to qui tam actions by "persons" under the CFCA. Such a suit is brought, not only for the qui tam plaintiff, but "*for* the State of California *in the name of the state*, if any state funds are involved, or *for* a political subdivision *in the name of the political subdivision*, if political subdivision funds are exclusively involved." (Gov. Code, § 12652, subd. (c)(1), italics added.) If the Attorney General or local prosecuting authority elects not to intervene and proceed with the action, "the qui tam plaintiff shall have the same right to conduct the action as the Attorney General or prosecuting authority would have had if it had chosen to proceed . . . ." (*Id.*, subd. (f)(1).) Hence, at the time a qui tam action is brought, the qui tam plaintiff stands in the shoes of the state or political subdivision, and within the TCA exemption for claims by the state or a local public entity.

 Moreover, as the Court of Appeal explained, the qui tam provisions of the CFCA are at odds with the policy behind the TCA's claim presentment requirement. The general proviso that a public entity may not be sued for money or damages until it has received, and had the chance to act upon, a written claim is intended to allow the entity to investigate while the facts are fresh, to settle short of litigation where appropriate, and to engage in fiscal planning for potential liability. (E.g., *City of San Jose v. Superior Court* (1974) 12 Cal.3d 447, 455 [115 Cal.Rptr. 797, 525 P.2d 701]; *Gatto v. County of Sonoma* (2002) 98 Cal.App.4th 744, 763 [120 Cal.Rptr.2d 550]; *Barkley v. City of Blue Lake* (1996) 47 Cal.App.4th 309, 316 [54 Cal.Rptr.2d 679].)

On the other hand, a qui tam complaint under the CFCA *must* be filed *under seal*, and immediately must be served, along with a written disclosure of all material evidence and information the qui tam plaintiff possesses, on the Attorney General. (Gov. Code, § 12652, subd. (c)(2), (3).) If political subdivision funds are involved, the Attorney General must forward these materials to the local prosecuting authority within 15 days. (*Id.*, subd. (c)(7)(A).) The complaint must remain sealed for up to 60 days after filing, with additional extensions available upon timely application, while the Attorney General or local prosecuting authority investigates and decides whether to intervene. (*Id.*, subd. (c)(2), (4), (6), (7).) During this period, the complaint must not be served on the defendant. (*Ibid.*) Moreover, once a qui tam action is filed, it cannot be settled without the consent of the court, "taking into account the best interests of the parties involved and the public purposes behind [the CFCA]." (*Id.*, subd. (c)(1).)

No California decision has discussed the purpose of the CFCA's seal requirement. However, several federal cases, addressing the FFCA's similar provision, have indicated that the interests served include making sure the qui tam action does not alert wrongdoers, prior to intervention by the government, that they are under investigation. (E.g., *U.S. ex rel. Lujan v. Hughes Aircraft Co.* (9th Cir. 1995) 67 F.3d 242, 245–246; *United States ex rel. Pilon v. Martin Marietta Corp.* (2d Cir. 1995) 60 F.3d 995, 1000; *Erickson v. American Institute of Bio. Sciences* (E.D.Va. 1989) 716 F.Supp. 908, 912.)

The CFCA does not explicitly *preclude* a potential qui tam plaintiff, *prior* to filing a CFCA complaint, from disclosing to the potential defendant the basis of the claim, or even from attempting to settle it. But the CFCA's purposes would obviously be undermined if CFCA qui tam plaintiffs were *required*, under the TCA, to present "local public entity" defendants, as defined in that statute, with written claims before proceeding with suit.

The charter school defendants urge that this construction of the two statutes improperly "elevates" the CFCA over the TCA. Not so. As we have noted, the TCA includes an explicit exemption from the claim presentment requirement for claims by the state and local public entities. Qui tam actions under the CFCA are, in essence, claims of that kind. In any event, in view of the secrecy provisions of the CFCA, a later and more narrowly focused statute, it must prevail over contrary provisions of the earlier and more general TCA.[37]

[37] Defendant Sierra Summit Academy urges that the claim presentment requirement of the TCA is made applicable to the CFCA by Government Code section 12651, subdivision (e), which provides, in effect, that the CFCA is not violated by claims made pursuant to the TCA. We fail to follow the logic of this argument. That claims made pursuant to the TCA do not violate the CFCA does not mean a CFCA action against a public entity must be preceded by presentment of such a claim. Insofar as this defendant seeks to argue that section 12651,

We therefore conclude that even if the charter school defendants are "local public entities" for purposes of the TCA, plaintiffs were not required under that statute to present written claims before filing their qui tam complaint pursuant to the CFCA.[38]

## CONCLUSION

The judgment of the Court of Appeal is reversed insofar as it concludes that (1) the public school defendants are "persons" subject to suit under the CFCA, (2) the charter school defendants are not "persons" subject to suit under the UCL, and (3) the "independent study" restrictions set forth in Education Code section 51747.3, in the form adopted in 1993, did not apply to charter schools until that section was amended in 1999. In all other respects, the judgment of the Court of Appeal is affirmed. *LeVine v. Weis, supra,* 68 Cal.App.4th 758, and *LeVine v. Weis, supra,* 90 Cal.App.4th 201, are disapproved to the extent they hold that public school districts are "persons" who may be sued under the CFCA. The cause is remanded to the Court of Appeal for further proceedings consistent with the views expressed in this opinion.

George, C. J., Chin, J., Moreno, J., Corrigan, J., and Irion, J.,* concurred.

---

subdivision (e) exempts *it* from the CFCA, the claim lacks merit on this record. There is no indication that Sierra Summit Academy's claims for state education funding—the basis of plaintiffs' CFCA cause of action—were presented pursuant to the TCA.

[38] The charter school defendants suggest alternatively that, as "public entities" for purposes of the TCA, they enjoy, pursuant to that statute, *immunity* from CFCA liability. These defendants note the TCA's rule that a public entity is not liable for an "injury" where the public employee causing the injury is immune from liability. (Gov. Code, § 815.2, subd. (b).) They claim that submission of a false claim is a "discretionary act" and a "misrepresentation" for which a public employee, and thus the public entity, would be immune. (See *id.,* §§ 820.2, 822.2; see also § 818.8.) However, while the TCA was meant to supplant contrary common law, it was not intended to prevail over other statutes that impose liability in specific circumstances. (See *Nestle, supra,* 6 Cal.3d 920, 932; Cal. Law Revision Com. com., 32 West's Ann. Gov. Code (1995 ed.) foll. § 815, pp. 167–168.) As we have seen, the CFCA makes "persons," including "natural person[s], corporation[s], [and] organization[s]" (Gov. Code, § 12650, subd. (b)(5)), liable for the submission of false claims (*id.,* §§ 12651, 12652). Insofar as "persons," as defined in the CFCA, include the corporations that operate the charter schools in this case, they are not entitled to immunity under the TCA. The charter school defendants note that immunities specified in the TCA prevail over liabilities set forth in that statute. (Cal. Law Revision Com., com., 32 West's Ann. Gov. Code, *supra,* foll. § 185, p. 168.) But this principle applies only *within the TCA itself* (Cal. Law Revision Com., com., 32 West's Ann. Gov. Code, *supra,* foll. § 185, p. 168); it does not preclude the Legislature from adopting other statutes that impose liability in specific circumstances, despite immunities stated in the TCA.

*Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**KENNARD, J.,** Concurring and Dissenting.—I concur in the majority's holdings that: (1) public school districts are not subject to lawsuits under the California False Claims Act; (2) the charter schools in this case and their operators are subject to lawsuits under the California False Claims Act and the unfair competition law; (3) plaintiffs' claims, except for the allegation that defendant One2One Learning Foundation failed to provide the education it promised, are not barred as claims for "educational malfeasance"; and (4) plaintiffs are not required to present written claims under the Tort Claims Act before filing a qui tam action under the California False Claims Act.

I dissent, however, from the majority's holding that Education Code section 51747.3[1] applied to charter schools before its amendment in 1999, which became effective on January 1, 2000. That holding violates the rule that courts are to harmonize and maintain the integrity of statutes whenever possible, and it is contradicted by the legislative history of the 1999 amendment to section 51747.3.

Section 51747.3 was originally enacted in 1993. As here pertinent it (1) prohibited a local education agency from claiming state funding for students in independent study programs if the agency provided funds or other things of value beyond what it provided to students who attend regular classes; (2) prohibited school districts and county superintendents of schools, notwithstanding any other provision of law applicable to them, from claiming average daily attendance (for purposes of apportionment of funds) for students who were not residents of their county or a county immediately adjacent to their county; and (3) provided that its provisions *could not be waived* by the State Board of Education, by the State Superintendent of Public Instruction, or "*under any provision of Part 26.8 (commencing with Section 47600).*" (Stats. 1993, ch. 66, § 32, p. 923, italics added.) Section 47600 is the first statute appearing in the Charter School Act. In 1999, the Legislature amended section 51747.3 to apply its provisions to charter schools. (Stats. 1999, ch. 162, § 1.)

Seizing on the language in the 1993 enactment of section 51747.3 prohibiting waiver of that statute's provisions under the Charter School Act, the majority reasons that the waiver reference serves no purpose if section 51747.3 did not apply to charter schools. Perhaps so. But the majority's construction cannot be reconciled with the plain language of other statutory provisions, as I explain.

Section 51747.3, when enacted in 1993, provided that school districts and county superintendents of schools could not claim students from outside the

---

[1] All further statutory references are to the Education Code unless otherwise indicated.

county or adjacent counties in average daily attendance. Charter schools, however, were prohibited by subdivision (d) of former section 47605 (as added by Stats. 1992, ch. 781, § 1, pp. 3756, 3758) from excluding students on the basis of their residence even if they lived beyond those boundaries. And at that time the Charter School Act then also provided, in former section 47610 (as added by Stats. 1992, ch. 781, § 1, pp. 3756, 3760), that a charter school was exempt from all laws governing school districts except as specified in section 47611. Because section 51747.3, a law that governs school districts, was not then specified in section 47611, it had no applicability to charter schools. Thus, the majority's construction of section 51747.3, as originally enacted in 1993, as applying to charter schools is flatly inconsistent with the language of former sections 47605, subdivision (d), 47610, and 47611. In my view, the relevant statutory provisions are best harmonized and given effect by construing section 51747.3, as originally enacted in 1993, as being inapplicable to charter schools. Such applicability occurred only on January 1, 2000, the date on which the Legislature's 1999 amendment of section 51747.3 became effective.

The legislative history of section 51747.3 further underscores the error of the majority in construing the language of that statute's 1993 amendment as applying to charter schools. The Legislative Counsel's Digest of Senate Bill No. 434 (1999–2000 Reg. Sess.), which in 1999 proposed amending section 51747.3, specifically noted that the bill was *adding* charter schools to the statute: "(2) Existing law prohibits a local education agency from claiming state funding for the independent study of a pupil, whether characterized as home study or otherwise, if the agency has provided any funds or other thing of value to the pupil or his or her parent or guardian that the agency does not provide to pupils who attend regular classes or to their parents or guardians. [¶] *This bill would make this prohibition applicable to charter schools . . . .* [¶] (3) Existing law requires community school and independent study average daily attendance to be claimed by school districts and county superintendents of schools only for pupils who are residents of the county in which the apportionment claim is reported or pupils who are residents of the county in which the apportionment claim is reported or pupils who are residents of a county immediately adjacent to the county in which the apportionment claim is reported. [¶] *This bill would apply this provision also to charter schools.*" (Leg. Counsel's Dig., Sen. Bill No. 434 (1999–2000 Reg. Sess.), italics added; accord, Sen. Com. on Education, Analysis of Senate Bill No. 434 (1999–2000 Reg. Sess.) June 28, 1999 ["Distance learning most closely resembles independent study in other public schools, but charter schools are not specifically required to abide by the independent study requirements that apply to other public schools"].) Thus, as the Court of Appeal here concluded, the legislative history indicates that it was only in 1999 that the Legislature intended to add charter schools to section 51747.3.

Accordingly, I would affirm the judgment of the Court of Appeal, which in turn affirmed the trial court, insofar as it concluded that section 51747.3, as originally enacted in 1999, did not apply to charter schools, and that it was only when the statute's 1999 amendment became effective on January 1, 2000, that charter schools came within the statute's reach.

The petition of defendants and respondents for a rehearing was denied October 25, 2006, and the opinion was modified to read as printed above. Werdegar, J., did not participate therein.