Filed 11/5/21; Modified and certified for publication 11/30/21 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E073390 |
| v. | (Super.Ct.No. FWV18004475) |
| CHELSEA TAYLOR GIDDENS, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County. Ingrid Adamson Uhler, Judge. Affirmed.

Taylor L. Clark, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson and Junichi P. Semitsu, Deputy Attorneys General for Plaintiff and Respondent.

1

While an inmate at West Valley Detention Center, defendant Chelsea Giddens threw a milk carton filled with urine at a deputy, hitting her in the face. As a result of the incident, which was recorded by one of the jail's security cameras, the prosecution charged Giddens with one count of "gassing" a peace officer (Pen. Code, § 243.9), an aggravated form of battery that occurs when an inmate intentionally causes "any mixture containing human excrement or other bodily fluids" to make contact with the officer's "skin or membranes." (Pen. Code, § 243.9, subd. (b), unlabeled statutory citations refer to this code.)

At trial, the prosecution played the security footage for the jury, and the deputy testified she was certain the "salty, warm" liquid that splashed into her eyes and mouth was urine. Giddens testified in her own defense and denied throwing anything at the deputy, but her attorney presented a different theory during closing statements, arguing the prosecution had failed to prove beyond a reasonable doubt the liquid was urine as it was just as likely Giddens had made a concoction of warm water and rotting food from her cell. The jury found Giddens guilty as charged.

On appeal, she asserts the following three grounds for reversing her conviction: (1) the jail violated section 243.9's mandatory duty to collect a sample of the suspected gassing substance and test it to determine whether it in fact contains a bodily fluid; (2) the failure to test the contents of the liquid also violated her due process rights to the disclosure of potentially exculpatory evidence; and (3) the trial judge erroneously denied

2

her section 1118.1 motion to dismiss the gassing charge for insufficient evidence. We disagree on each point and affirm.

## I

## FACTS

At West Valley Detention Center in Rancho Cucamonga, inmates receive their meals on styrofoam trays delivered through a foot-wide "tray slot" in the center of their cell doors. The jail employs a tray-for-tray mealtime policy, for sanitary reasons. To receive the current meal, inmates must pass the spent trays from their previous meal through the slot so they may be disposed of and don't remain in the cells for extended periods of time. On August 17, 2018, San Bernardino County Sheriff's Deputy Jenna Van Leer was on lunch duty in Giddens's unit delivering trays of food. When she reached Giddens's cell, Deputy Van Leer could see through the window in her door that Giddens had taken off her pants and was wearing only her shirt and underwear and that she had multiple spent trays stacked in her cell.

Deputy Van Leer opened the tray slot in Giddens's door and asked for her spent trays. Giddens refused to hand them over, so Deputy Van Leer finished serving the rest of the unit before returning to Giddens's cell. As Deputy Van Leer served the others, Giddens started throwing her spent trays out of her tray slot. When Deputy Van Leer returned, Giddens pushed her hands through the slot and demanded her lunch. Deputy Van Leer asked Giddens to remove her hands from the slot. She refused and she pushed back against the slot as Deputy Van Leer tried to close it. Deputy Van Leer told Giddens

3

she would give her the meal (which consisted of two trays) if she removed her hands, and Giddens complied. But as the deputy bent down to give her the trays, Giddens ran to the back of her cell and grabbed an eight-ounce milk carton. The carton had been completely unsealed and opened at the top so it resembled a square cup. Giddens hurled the carton at Deputy Van Leer. When it hit the cell door, some of its contents splashed through the opening between the frame and the door and hit the deputy's face and hair. As she wiped the liquid off her face with her sleeve, Giddens said angrily, "You should have given me my trays the first time, cunt," then laughed.

Deputy Van Leer called her partner, Deputy Tyler Gilbert, for assistance, and when he learned what had happened he took her to the hospital where she received blood tests to determine whether she had contracted any infections from the incident. When Deputy Gilbert returned to Giddens's cell about 15 minutes later to remove her, he found Giddens nude and wet. She had flooded her cell by clogging her toilet, and she had smeared feces on her tray slot. Deputy Gilbert also noticed feces on Giddens's hands when she slid them through the slot to be handcuffed.

At trial, the prosecution played the surveillance footage of Deputy Van Leer delivering lunch to the unit. The second time she stops at Giddens's cell, you see her bend down to slide the trays through the slot then jump back and wipe her face with her sleeve. Deputy Van Leer told the jury that as soon as the liquid dripped into her mouth, she knew it was urine. She said it was warm, salty, and clear, and neither tasted nor looked like any of the beverages served to inmates (a limited list consisting of just milk,

4

water, coffee, and Kool-Aid). She said while she doesn't "go around tasting urine," she used to be an emergency medical technician (EMT), an occupation that involved frequent close contact with the bodily fluid. She said she had "been peed on" multiple times as an EMT. "It's part of the job."

When asked if the jail had tested the liquid to determine whether it was, in fact, urine, Deputy Van Leer said she wasn't sure if such testing was available, and in any event, there wasn't enough of the liquid on her or the floor to collect a sample. During cross-examination, defense counsel asked her why she had described it as an "unknown liquid" in her incident report if she was certain it was urine. She explained she had wanted to call the liquid urine, but her sergeant instructed her not to, despite the fact she was "a hundred percent sure" what it was.

Echoing Deputy Van Leer, Deputy Gilbert said it would have been impossible to collect a sample of the liquid by the time he reached Giddens's cell because Giddens had flooded it. He had similarly described the substance as an "unknown liquid" in his incident report but added that it "appeared to be urine."

Giddens testified in her own defense and denied ever having thrown "anything, any date, any year, at anyone." When asked about the surveillance footage, she said, "I did not see anything on the surveillance video. I don't even believe that was even me to tell you the truth." She said the person in the video was actually "a woman named Mary" and that she felt bad for Mary because Deputy Van Leer wasn't feeding her. She also denied smearing feces on her tray slot. She said the brown substance Deputy Gilbert

5

discovered (and photographed) when he returned to her cell was actually "California State Certified discipline loaf," which "looks like feces and it tastes like feces, and they force you to eat it."

To rebut Giddens's claim that she had never thrown anything at any of the deputies, the prosecution called Deputy Ryan Chen, who said that four days before the incident with Deputy Van Leer, he had been called to clean Giddens's cell because she had smeared feces inside it. When he arrived outside her cell door, Giddens, who was inside, naked, threw a "white container" full of liquid at him and said, "Eat my shit, bitch." As they had with Deputy Van Leer, the container's contents splashed through the opening between the frame and the door and hit Deputy Chen's face and body. He said the liquid smelled foul and was not milk.

The prosecution also recalled Deputy Gilbert, who said the "disciplinary diet" at West Valley Detention Center consists of a meat and vegetable loaf that has a crumbly texture similar to bread, and it is served only twice a day, at breakfast and dinner. He said he had been in close proximity to the brown substance on Giddens's tray slot and hands and was sure it was feces and not food.

During closing argument, defense counsel argued the prosecution had not met their burden of proving the liquid was urine. He pointed out that because Giddens had old food trays in her cell at the time and because the jail had not collected and tested the liquid, it was "not . . . unreasonable" to infer "the liquid consisted of rotting food, water

or a mixture thereof." The jury convicted Giddens of a single felony count of battery of a peace officer by gassing (§ 243.9), and the trial judge sentenced her to one year in prison.

Giddens filed a timely notice of appeal.

## II

## ANALYSIS

### A.     *Section 243.9*

Giddens makes two arguments why the lack of testing to determine the contents of the liquid she threw at Deputy Van Leer requires reversal of her gassing conviction. First, she claims section 243.9 imposes a mandatory duty on the correctional facilities where suspected gassing incidents occur to test the suspected substance to ensure it meets the statutory definition of a gas (i.e., contains bodily fluids). Second, she says that even if the statute doesn't impose such a duty, West Valley Detention Center's failure to perform such testing in this case is evidence of a bad faith failure to preserve "potentially exculpatory evidence" in violation of her constitutional due process rights. Both arguments fail.

We start with Giddens's assertion of a statutory duty. The meaning of a statute is a question of law we address using our independent judgment. (*People v. Valdez* (2018) 28 Cal.App.5th 308, 312 (*Valdez*).) Our task when interpreting statutes is to discern the Legislature's intent "so as to effectuate the purpose of the law." (*DuBois v. Workers' Comp. Appeals Bd.* (1993) 5 Cal.4th 382, 387.) "The statutory language itself is the most reliable indicator, so we start with the statute's words, assigning them their usual and

7

ordinary meanings, and construing them in context. If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs. On the other hand, if the language allows more than one reasonable construction, we may look to such aids as the legislative history of the measure and maxims of statutory construction. In cases of uncertain meaning, we may also consider the consequences of a particular interpretation, including its impact on public policy." (*Wells v. One2One Learning Foundation* (2006) 39 Cal.4th 1164, 1190; see also *People v. Zambia* (2011) 51 Cal.4th 965, 972.)

Section 243.9 governs gassing in a jail or local detention facility and consists of multiple subdivisions.[1] The first, subdivision (a), categorizes the offense as an aggravated form of battery and provides that "[e]very person confined in any local detention facility who commits a battery by gassing upon the person of any peace officer" is guilty of a felony. (§ 243.9, subd. (a).) Subdivision (b) defines "gassing" as "intentionally placing or throwing, or causing to be placed or thrown, upon the person of another, any human excrement or other bodily fluids or bodily substances or any mixture containing human excrement or other bodily fluids or bodily substances that results in actual contact with the person's skin or membranes." (§ 243.9, subd. (b).) In defining gassing, the provision also implicitly defines a gassing substance as "any mixture containing human excrement or other bodily fluids or bodily substances." (*Ibid.*)

---

[1] Section 4501.1 governs gassing in state prisons and is essentially identical to section 243.9.

Subdivision (c)—the provision at issue—directs the jail or local detention facility to promptly investigate every reported incident of gassing. (§ 243.9, subd. (c).) The provision states: "The person in charge of the local detention facility shall use every available means to immediately investigate all reported or suspected violations of subdivision (a), including, but not limited to, the use of forensically acceptable means of preserving and testing the suspected gassing substance to confirm the presence of human excrement or other bodily fluids or bodily substances. If there is probable cause to believe that the inmate has violated subdivision (a), the chief medical officer of the local detention facility, or his or her designee, may, when he or she deems it medically necessary to protect the health of an officer or employee who may have been subject to a violation of this section, order the inmate to receive an examination or test for hepatitis or tuberculosis or both hepatitis and tuberculosis on either a voluntary or involuntary basis immediately after the event, and periodically thereafter as determined to be necessary by the medical officer in order to ensure that further hepatitis or tuberculosis transmission does not occur. . . . The results of any examination or test shall be provided to the officer or employee who has been subject to a reported or suspected violation of this section." (*Ibid.*)

Finally, subdivision (d) requires the jail or local detention facility to "refer all reports for which there is probable cause to believe that the inmate has violated subdivision (a) to the local district attorney for prosecution" (§ 243.9, subd. (d)), and

9

subdivision (e) makes clear that "[n]othing in this section shall preclude prosecution under both this section and any other provision of law." (§ 243.9, subd. (e).)

According to Giddens, subdivision (c) was enacted for the inmate suspect's benefit, to ensure there is direct proof they used a gassing substance within the meaning of subdivision (b). Giddens focuses on the first part of the provision, which says that a prompt investigation shall include "preserving and testing" the substance "to confirm the presence of human excrement or other bodily fluids or bodily substances." (§ 243.9, subd. (c).) She argues that the inclusion of a preservation requirement inures to the inmate's benefit only, as a means of determining whether they in fact violated the statute.

But Giddens's interpretation ignores the rest of the provision, which, in our view, reveals the purpose behind the prompt investigation mandate. The provision goes on to say that when there is "probable cause to believe that the inmate has violated subdivision (a)," the chief medical officer of the facility may order the inmate to be tested for hepatitis and tuberculosis—contagious diseases commonly transmitted through bodily fluids—"*in order to ensure that further hepatitis or tuberculosis transmission does not occur*." (§ 243.9, subd. (c), italics added.) Additionally, all test results must be provided to the potential gassing victim. (*Ibid.*) Nothing in the provision mentions or relates to evidence gathering for prosecutorial purposes. In fact, section (e) underscores that the medical testing and investigation protocols in subdivision (c) "shall [not] preclude" a prosecution for gassing in violation of subdivision (a). In other words, subdivisions (a) and (c) are independent; the latter does not inform or restrict the former.

10

We find the text of this provision unambiguous. Whether read in isolation or in conjunction with the rest of the statute, it is clear the class protected by the investigation called for in subdivision (c) are the potential gassing victims, not the violators. In other words, the purpose of the prompt investigation called for in subdivision (c) is to ensure that a battery by gassing does not lead to the transmission of communicable diseases or infections. This purpose in turn promotes the purpose of the statute as a whole, which is to "protect[] peace officers from battery by inmates." (*Valdez*, *supra*, 28 Cal.App.5th at p. 315.) We therefore conclude subdivision (c) does not create any rights for the inmate or impose a duty on the facility to preserve the suspected gassing substance for criminal evidentiary purposes.

But even if, for the sake of argument, we accepted Giddens's interpretation of subdivision (c), the provision's testing directive is not absolute. Subdivision (c) directs the facility to use "every *available* means" to investigate a suspected gassing incident. According to the evidence presented at trial, it would have been impossible to collect a sample of the liquid that hit Deputy Van Leer (because she immediately wiped it off with her sleeve), and Giddens herself made it impossible to collect a sample from the portion that remained in her cell by flooding her cell immediately after the incident. On this record, the jail was simply unable to collect a sample of the liquid.

This brings us to Giddens's second argument—that West Valley Detention Center's failure to preserve and test the liquid violated her constitutional right to the

disclosure of "potentially exculpatory evidence." Setting aside the fact she failed to raise this objection during trial, we find the objection meritless.

"Generally, due process does not require the police to collect particular items of evidence." (*People v. Montes* (2014) 58 Cal.4th 809, 837.) Instead, the constitutional guarantee of due process "imposes a duty on the state to preserve 'evidence that might be expected to play a *significant role* in the suspect's defense.'" (*Ibid.*, quoting *California v. Trombetta* (1984) 467 U.S. 479, 488.) To fall under this category, the evidence must "possess an exculpatory value that was *apparent before the evidence was destroyed*." (*Trombetta*, at p. 489, italics added.) And, unlike the government's duty to *disclose* material exculpatory evidence under *Brady v. Maryland* (1963) 373 U.S. 83—which applies regardless of the mindset of the government actors—the failure to "*retain* evidence that is potentially useful to the defense" does not violate due process "unless the accused can show *bad faith* by the government." (*City of Los Angeles v. Superior Court* (2002) 29 Cal.4th 1, 8, citing *Arizona v. Youngblood* (1988) 488 U.S. 51, 58, second italics added.)

In light of these principles, Giddens's constitutional challenge faces two insurmountable hurdles. First, she cannot demonstrate the liquid she threw at Deputy Van Leer was potentially or apparently exculpatory. Having felt the liquid on her skin and tasted it, Deputy Van Leer was certain it was urine, and that is a judgment any lay person, and certainly a former EMT, is capable of making. As a result, there was no reason to believe that testing the liquid's contents would exonerate Giddens by revealing an

12

innocuous composition. Second, and more importantly, Giddens cannot demonstrate bad faith on the jail's part because she was responsible for destroying the evidence she claims was missing from her trial.

For all of these reasons, we reject Giddens's statutory and constitutional claims of error.

B.    *The Section 1118.1 Motion*

At the close of evidence, defense counsel made an oral motion to dismiss the gassing charge under section 1118.1, which requires acquittal "if the evidence then before the court is insufficient to sustain a conviction." (§ 1118.1.) The judge noted that while Deputy Van Leer's incident report used the phrase "unknown liquid," her testimony at trial was that she was "100 percent certain it was urine." The judge concluded this conflict in the evidence was "obviously an issue of credibility for the jurors to decide" and denied the motion.

Gidden contends this ruling was incorrect. She argues the trial judge was required to grant her motion because the evidence was susceptible to "more than one reasonable inference" as to the liquid's composition. Acknowledging that the deputy's testimony supports a finding that the liquid was urine, she argues there was also enough evidence to support a contrary finding. Relying on the deputy's use of the phrase "unknown liquid" in her incident report and the evidence regarding the contents and layout of her cell, Giddens argues the record also permits the jurors to conclude the liquid contained no urine and was instead made up of some mix of water and decomposing food.

13

This argument conflates CALCRIM No. 224, the jury instruction on evaluating circumstantial evidence, with the standard for a motion to dismiss for insufficient evidence under section 1118.1. The former applies to the jury's deliberations and says that if the circumstantial evidence presented at trial supports two reasonable conclusions—one that points to guilt and the other to innocence—the jury must accept the one that points to innocence. But this rule does not apply to the threshold question section 1118.1 asks, which is "'simply whether the prosecution has presented sufficient evidence to present the matter to the jury for its determination.'" (*People v. Stevens* (2007) 41 Cal.4th 182, 200.) "The standard applied by a trial court in ruling upon a motion for judgment of acquittal pursuant to section 1118.1 is the same as the standard applied by an appellate court in reviewing the sufficiency of the evidence to support a conviction, that is, 'whether from the evidence, including all reasonable inferences to be drawn therefrom, there is *any substantial evidence* of the existence of each element of the offense charged.'" (*Ibid.*, italics added.)

Guided by the correct standard, it is obvious why Giddens's claim of error fails. By acknowledging that Deputy Van Leer's testimony reasonably supports a conclusion the liquid was urine, she necessarily also concedes the prosecution met its burden of presenting substantial evidence of guilt. Disposing of this issue does not require us to explain why, in our view, the jury could easily find Deputy Van Leer to be a more credible witness than Giddens and also find the evidence the liquid was urine was

14

stronger than the evidence it was not. The mere fact there was, as Giddens admits,

conflicting evidence of guilt, means the trial judge was correct to deny the motion.

## III

## DISPOSITION

We affirm the judgment.


SLOUGH
J.

We concur:

RAMIREZ
P. J.

MILLER
J.

15

CERTIFIED FOR PUBLICATION
COURT OF APPEAL -- STATE OF CALIFORNIA
FOURTH DISTRICT
DIVISION TWO

THE PEOPLE,

    Plaintiff and Respondent,

v.

CHELSEA TAYLOR GIDDENS,

    Defendant and Appellant.

E073390

(Super.Ct.No. FWV18004475)

The County of San Bernardino

ORDER MODIFYING OPINION
AND GRANTING PUBLICATION

[NO CHANGE IN JUDGMENT]

_____

THE COURT

    We GRANT the request to publish the opinion filed in this matter, which meets the standard for publication in California Rules of Court, rule 8.1105(c). The court ORDERS the opinion filed on November 5, 2021 certified for publication.

    On our own motion, the court ORDERS the opinion modified as follows:

1. In the last paragraph on page 10, delete the last two sentences, which state, "In fact, section (e) underscores that the medical testing and investigation protocols in subdivision (c) 'shall [not] preclude' a prosecution for gassing in violation of subdivision (a). In other words, subdivisions (a) and (c) are independent; the latter does not inform or restrict the former," and substitute the following two sentences: "In our view, that silence speaks volumes. If the Legislature had intended to depart from the general rule that violations of the Penal Code may be proven by any competent evidence, we think they would have made the new rule explicit."

2. In the second sentence of the first paragraph on page 11, add the phrase "and other people who may be exposed to infection," so the sentence reads: "Whether read in isolation or in conjunction with the rest of the statute, it is clear the class protected by the investigation called for in subdivision (c) are the potential gassing victims and other people who may be exposed to infection, not the violators."

3. At the end of the first paragraph on page 11, add the following sentence: "While the lack of forensic proof that the substance used is a bodily fluid may affect the strength of the prosecution's case, nothing in the statute suggests it should be fatal."

1

Except for these modifications, which do not affect the judgment, the opinion is unchanged.

CERTIFIED FOR PUBLICATION

SLOUGH _____

J.

We concur:

RAMIREZ _____

P. J.

MILLER _____

J.

cc:    See attached list

2

MAILING LIST FOR CASE: E073390
The People v. Chelsea Giddens


Superior Court Clerk
San Bernardino County
8303 N. Haven Ave
Rancho Cucamonga, CA 91730

Junichi P. Semitsu
Office of the Attorney General
P. O. Box 85266
San Diego, CA 92186-5266

Taylor L. Clark
P.O. Box 2887
Malibu, CA 90265

Appellate Defenders, Inc.
555 West Beech Street, Suite 300
San Diego, CA  92101 2396